RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0178p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

     *Plaintiff-Appellee,*

 *v.*

MARQUIS DERON HEARD,

     *Defendant-Appellant.*

No. 13-5649

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:11-cr-00073-1—Karen K. Caldwell, Chief District Judge.

Decided and Filed:  August 8, 2014

Before:  SUHRHEINRICH, KETHLEDGE, and WHITE, Circuit Judges.

---

### COUNSEL

**ON BRIEF:**  Neal Gary Rosensweig, NEAL GARY ROSENSWEIG, P.A., Hollywood, Florida, for Appellant.  Charles P. Wisdom, Jr., Brielle N. Bovee, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.  Marquis Deron Heard, Pine Knot, Kentucky, pro se.

 KETHLEDGE, J., delivered the opinion of the court, in which SUHRHEINRICH and WHITE, JJ., joined.  WHITE, J. (pg. 8), delivered a separate concurring opinion.

---

### OPINION

---

 KETHLEDGE, Circuit Judge.  A jury convicted Marquis Heard of numerous drug and money-laundering offenses after a three-day trial in which Heard represented himself.  His principal argument on appeal is that the district court was obligated to proceed with a hearing to

1

determine his competency to stand trial.  Heard also argues that his decision to represent himself was not voluntary.  We reject his arguments and affirm.

I.

Heard ran a large cocaine-distribution ring in Lexington, Kentucky, buying and selling several dozen kilograms of cocaine, if not more, every few months.  Heard laundered his drug money in various ways, which included making 23 cash payments—each less than $10,000, so as to avoid federal reporting requirements—towards the purchase of a home in Louisville.  Those payments totaled $182,600.  Using an alias, Heard also converted another $49,422 into jewelry that he purchased from a store in Louisville.  Heard's drug operation came to an end in June 2011, when police officers searched his Lexington home and two storage units.  Altogether the officers found a large quantity of drugs, drug paraphernalia, several firearms, and a bulletproof vest, among other items.

A federal grand jury thereafter indicted Heard for conspiracy to distribute five kilograms or more of cocaine, distribution of cocaine, possession with intent to distribute cocaine base, possession of a firearm after being convicted of a felony, conspiracy to commit money laundering, money laundering to conceal and disguise proceeds from an unlawful activity, money laundering involving property of value greater than $10,000, and money laundering to avoid reporting requirements.  *See* 18 U.S.C. §§ 922(g)(1), 1956(h), 1956(a)(1)(B)(i) & (ii); 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 851.  The district court appointed Andrew Stephens to represent Heard.

Heard was unhappy with the appointment.  During one meeting, Heard retreated to a bathroom stall and flushed the toilet whenever Stephens tried to speak with him.  Stephens thereafter filed a motion for a determination of Heard's competence to stand trial.  The district court granted the motion and ordered a mental evaluation.

Dr. Judith Campbell, a forensic psychologist, conducted the evaluation over a six-week period.  Among other things, Dr. Campbell conducted in-person interviews with Heard and various prison staff who had observed him; she conducted phone interviews with Stephens and the federal prosecutor assigned to the case; and she administered an intelligence test (the

Wechsler Adult Intelligence Scale, Fourth Edition) and a personality test (the Minnesota Multiphasic Personality Inventory-2) to Heard. Dr. Campbell then summarized her findings in a ten-page single-spaced report. She stated that Heard's behavior "was observed to be consistently calm, well-controlled, organized, planned, purposeful, and goal-directed"; that Heard "functioned normally in carrying out daily activities"; and that he "conducted himself properly in the institution, interacted appropriately with others, socialized with his peers, and sought the assistance of staff as needed." Report at 3-4. She also reported that Heard scored in the "Average range" for "intellectual functioning[,]" and that "[h]e consistently presented himself as intelligent and articulate and demonstrated a concise memory for the steps leading up to his current legal status." *Id*. at 4, 7.

As for personality, Dr. Campbell reported that Heard "presented with an inflated, exaggerated sense of self-importance"; that his responses to the personality test suggested "poor impulse control, with tendencies to act out in unpredictable and somewhat destructive ways"; that he is "suspicious, mistrustful, easily threatened, and likely to respond to stressors with belligerent behavior and emotional outbursts"; and that "Heard appeared extremely distrustful of his attorney, but did not evidence paranoia of delusional proportions." *Id*. at 5-6. Dr. Campbell diagnosed Heard with "Personality Disorder Not Otherwise Specified"—essentially, a diagnosis that Heard has a personality disorder, but does not present a sufficient concentration of features (typically five or more) of any single disorder to be diagnosed with it—"with exhibited features of Narcissistic, Paranoid, and Antisocial Personality Disorders." *Id*. at 8. But Dr. Campbell noted that "[p]ersonality disorders are not considered a severe mental illness, largely because they are viewed as more intentional or volitional than other psychiatric disorders." *Id*. She added that Heard "displayed no bizarre behavior, disorganization, or confusion characteristic of psychosis[,]" and that "there was no indication Mr. Heard was experiencing a thought disorder, as his thought process was clear, coherent, well-organized, and goal-directed." *Id*. at 5-6. She concluded: "Mr. Heard has not been diagnosed with a mental condition which would prevent him from proceeding competently to trial." *Id*. at 8.

About a month later, the district court held a hearing in which the court asked Stephens (still Heard's counsel at the time) whether, in light of Dr. Campbell's report, he wanted to

stipulate to Heard's competency.  Stephens responded that he lacked authority to answer because Heard refused to speak to him.  Eventually Heard addressed the court and stated that he wanted to waive his right to counsel and represent himself.  In a colloquy that runs 12 pages in the hearing transcript, the district court then warned Heard about the dangers of representing himself and expressly advised him not to do it.  Heard insisted on representing himself.  The court finally granted his request and asked whether Heard wanted to contest Dr. Campbell's conclusions regarding his competency.  Heard declared that he was competent and said that he did not want a hearing on the issue.  The court then stated, "[a]ll right.  The defendant has stipulated to his competency."

Heard thereafter represented himself at trial.  A jury convicted Heard of most of the charges against him.  The district court sentenced him to 360 months in prison.  This appeal followed.

II.

Heard argues that the district court violated his right to a fair trial when, after Heard stipulated to his competency, the court failed to proceed *sua sponte* with his competency hearing. We review for an abuse of discretion the district court's determination not to conduct a competency hearing.  *United States v. Ross*, 703 F.3d 856, 867 (6th Cir. 2012).

A district court is obligated "to inquire into a defendant's competency whenever there is reasonable cause to believe that the defendant is incompetent to stand trial."  *United States v. Denkins*, 367 F.3d 537, 545 (6th Cir. 2004) (internal quotation marks omitted).  A defendant is competent to stand trial if he has "a rational as well as factual understanding of the proceedings against him" and "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding."  *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam).

Here, the court did inquire into Heard's competency—by ordering a thorough mental evaluation—after Stephens reported that Heard had locked himself in a bathroom stall.  The results of that evaluation did not provide any reasonable cause for concern that Heard was incompetent.  To the contrary, Dr. Campbell specifically found that Heard's "responses reflected

a somewhat sophisticated understanding of the court's procedures, the various participants, and the possible outcomes of his pending criminal charges[,]" and that "Mr. Heard is capable of understanding his legal situation, navigating the legal system, and consulting with his attorney, should he so choose." Report at 5, 8.

Heard responds that the district court was obligated to inquire further into his competency because Dr. Campbell had diagnosed him as having a personality disorder with Narcissistic, Paranoid, and Antisocial features. But that argument seriously misunderstands the nature of Dr. Campbell's diagnosis. Personality disorders are not psychoses; as Dr. Campbell herself observed in her report, Heard's "diagnosis is not a condition which interferes significantly with Mr. Heard's routine functioning, substantially impairs his reasoning or reality testing, or prevents him from comprehending or controlling his actions." Report at 8. Quite the contrary: people with personality disorders are present in all walks of life. Narcissists, for example, are relatively "prevalent in professions that are unusually respected, including law, medicine, and science, or those that boast celebrity status, such as entertainment, sports, and politics." Millon, et al., *Personality Disorders in Modern Life* (2d ed. 2004) at 333-34. Notable paranoids, meanwhile, include J. Edgar Hoover and Joseph McCarthy. *Id*. at 440. And antisocials fill the nation's prisons: indeed the first criterion of an antisocial personality is a "failure to conform to social norms with respect to behaviors as indicated by repeatedly performing acts that are grounds for arrest[.]" *Id.* at 152 (quoting the DSM-IV criteria). Thus, to equate personality disorders with legal incompetence is simply to misunderstand what those terms mean. *See generally, e.g., United States v. Gabrion*, 719 F.3d 511, 533-34 (6th Cir. 2013) (en banc) (capital defendant with Narcissistic, Histrionic, and Antisocial Personality Disorders was competent); *United States v. Saingrerard*, 621 F.3d 1341, 1342-43 (11th Cir. 2010) (per curiam) (defendant with Paranoid Personality Disorder was competent); *United States v. Clements*, 522 F.3d 790, 795-96 (7th Cir. 2008) (defendant with Antisocial Personality Disorder was competent). That Heard has a personality disorder does not make him any more incompetent to stand trial than, say, Hoover would have been.

Heard otherwise lacks any basis to show that the district court had reason to doubt his competency. That Heard refused to cooperate with Stephens is not such a reason; "Heard is

capable of working collaboratively with his attorney[,]" but simply chose not "to do so." Report at 9; *see also United States v. Miller*, 531 F.3d 340, 349 (6th Cir. 2008) ("[A] defendant is not rendered incompetent to stand trial simply because he cannot get along with his counsel or disapproves of his counsel's performance."). Nor is that Heard steadfastly insisted that the district court lacked jurisdiction over his case; as Dr. Campbell noted, "[i]t is important to note that [Heard's] beliefs, including his rigid adherence to those beliefs, were not, in any way, delusional or psychotic in nature. He retained his ability to think flexibly and engage in strategic planning, but was simply unwilling to admit he was incorrect in his opinion." Report at 3. Nor is that Heard suspected that Stephens and the district judge were conspiring against him; "[s]uspiciousness about the criminal justice system (including attorneys) is ubiquitous among criminal defendants, and should not be viewed as a reliable indicator of mental illness." *Id.* at 10.

Thus, as in *Denkins*, any cause for concern about Heard's competency "was dissipated by the results of the competency examination." 367 F.3d at 546. The district court did not abuse its discretion by choosing not to inquire further into Heard's competency than it already had.

B.

Heard also argues that his waiver of counsel was not knowing and intelligent. Our standard of review for this issue is unclear: some panels have reviewed the validity of a defendant's waiver of counsel for plain error, others have reviewed the waiver de novo. *See Ross*, 703 F.3d at 866. We elide the discrepancy here because Heard's argument fails under either standard.

To ensure that a defendant's waiver of his right to counsel is knowing and intelligent, the district court "must ask the defendant a series of questions drawn from, or substantially similar to the model inquiry set forth in the *Bench Book for United States District Judge*." *Id.* at 867. The district court substantially complied with that obligation here: the court asked whether Heard had legal training, whether he had represented himself in a criminal proceeding before, whether he understood the charges against him and the serious penalties he faced if convicted, and whether he understood that the court could not assist him at trial, among many other questions. The court also warned Heard at considerable length about the disadvantages of representing

himself; and the court renewed its admonitions in its pretrial conference and during voir dire. Yet at every turn Heard insisted upon exercising his right to represent himself. *See generally Faretta v. California*, 422 U.S. 806, 834 (1975). The record establishes, therefore, that Heard's waiver of his right to counsel was both knowingly and intelligently made.

Heard responds that his waiver was not voluntary because he told the district court that "I have no other choice" but to represent himself. But this is an argument about semantics. Heard's assertion that he had "no other choice" but to represent himself was based upon Stephens's refusal to file a frivolous motion challenging the court's jurisdiction. Thus, Heard's decision to represent himself was based not upon any coercion to dispense with his appointed counsel, but upon a choice: Heard's own choice to insist upon challenging the court's jurisdiction. Heard's waiver of counsel was knowing and intelligent.

Finally, Heard also appears to argue that he was not competent to represent himself at trial. In support, he cites *Indiana v. Edwards*, 554 U.S. 164 (2008), where the Supreme Court held that, "[in] certain instances," a defendant might be competent to stand trial but still be "unable to carry out the basic tasks needed to present his own defense without the help of counsel." *Id.* at 175-76. *Edwards* is easily distinguishable, however, because the defendant there was schizophrenic. And otherwise, for substantially the reasons already stated above, we defer to the district court's determination that Heard did not "suffer from severe mental illness to the point where" he was "not competent to conduct trial proceedings by [himself]." *Id*. at 178.

The district court's judgment is affirmed.

_____

**CONCURRENCE**

_____

HELENE N. WHITE, Circuit Judge, concurring.  I concur in the affirmance.  I write separately to make clear that although the majority accurately observes that personality disorders are commonplace among the notable and accomplished as well as the antisocial and criminal, and personality disorders cannot be equated with incompetence to represent oneself, it does not follow that an individual defendant's personality disorder cannot render that defendant incompetent to stand trial or represent himself.  As the Supreme Court observed in *Indiana v. Edwards*, 554 U.S. 164, 177 (2008),  "[t]he trial judge . . . will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant."  *Id*.  I therefore defer to the district court's judgment that Heard did not "suffer from severe mental illness" rendering him "not competent to conduct trial proceedings himself." *Id*. at 178.

I note also that Heard should have been represented by counsel at the competency hearing.  *United States v. Ross*, 703 F.3d 856, 874 (6th Cir. 2012); 18 U.S.C. § 4247(d).  However, the record shows that standby counsel provided adequate representation and was familiar with the competency report and Heard's ability to understand and cooperate.  Further, district courts should be mindful that, as noted by the Supreme Court in *Edwards*, 554 U.S. at 175–76, a defendant's competency to stand trial and to represent himself present separate inquiries.  ("In certain instances, an individual may well be able to satisfy [the *Dusky v. United States*, 362 U.S. 402 (1960))] competency standard [to stand trial], for he will be able to work with counsel at trial, yet at the same time he may be unable to present his own defense without the help of counsel.").