NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0685n.06

No. 14-5950

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Oct 08, 2015 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| RONNIE JACKSON, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

Before: GUY, KETHLEDGE, and STRANCH, Circuit Judges.

KETHLEDGE, Circuit Judge. A federal jury convicted Ronnie Jackson of numerous robbery and firearm offenses after a three-day trial in which Jackson represented himself. On appeal, he argues that the district court should have granted his motion for substitute counsel and, relatedly, that his decision to represent himself was not voluntary. We reject his arguments and affirm.

I.

Jackson and several accomplices committed six armed robberies at businesses in the Memphis, Tennessee area. Police captured him at the scene of the last robbery.

A federal grand jury indicted Jackson for one count of robbery affecting interstate commerce and one count of using a firearm during a crime of violence. *See* 18 U.S.C. §§ 1951, 924(c). The district court appointed T. Clifton Harviel, Jr. to represent Jackson.

Three months later, Jackson asked the court to remove Harviel and appoint new counsel. Although the court found that Harviel had met all of his obligations to Jackson, the court granted Jackson's request. The court appointed Jeff Woods to represent Jackson.

Jackson was soon unhappy with Woods too. A month after his appointment, in February 2013, Jackson wrote to the court complaining that Woods was "fail[ing] to communicate with [him]." At a hearing the following month, Jackson complained that he was constantly being "shipped around" farther away from his attorney and indicated (by shaking his head) that Woods was not able to meet with him at Jackson's current "detention center." But the court responded that Woods would surely alert the court if he could not access his client.

In April, Woods filed a motion to transfer Jackson to a facility closer to Memphis—where his criminal trial would occur. At a later hearing, Woods expressed concern that Jackson's detention center was 150 miles away:

> [Jackson] has a right to representation, and he's been afforded representation, but I think implicit in that is the ability to communicate and see the client, and you are hard pressed to find any criminal defense attorney who's got—I mean because I've got to drop an entire day just to go out there.

The district court asked Woods to contact the U.S. Marshal and request Jackson's transfer before the court ruled on his motion.

Later in April, Jackson sent a letter to the magistrate judge requesting new counsel. In June, Jackson sent a letter to the district court judge with the same request. In support, Jackson wrote that Woods had not visited him or written to him about his case. That same month, a grand jury issued a superseding indictment charging Jackson with six counts of robbery affecting interstate commerce and six counts of using a firearm during a crime of violence.

In a July hearing, the district court addressed Jackson's concerns about Woods. Jackson said that he and Woods had met only once—after Jackson's letters to the court complaining about Woods's lack of contact. Woods explained that a visit to Jackson's detention facility was "377 miles round trip." Woods also said that he understood the issues in the case and had spoken to the prosecutor on "numerous occasions." Woods added that he had examined the discovery file, given Jackson some case law regarding the district court's jurisdiction over his case, and sought Jackson's transfer to a closer facility. Woods explained that Jackson had not been transferred sooner because of a problem with a required health test. But Woods thought the problem had been solved and that Jackson would be transferred soon. The district court seemed satisfied that Jackson's transfer would resolve any communication concerns and Jackson agreed.

The court then addressed Jackson's other primary concern, namely jurisdiction over his case. Jackson was insistent that the district court had none and that Woods should file a motion to that effect. The court explained that such a motion would be frivolous and that, as an officer of the court, Woods could not file it. Finally, after an extended colloquy on the subject, the court stated that "I've already made a determination that this Court has jurisdiction[.]"

After still more discussion, Jackson said he was considering representing himself. The court then put Jackson under oath and asked him about his legal education and experience, explained the charges against him and their potential penalties, warned Jackson about the dangers of representing himself, and expressly advised him not to do so. That colloquy runs eight pages in the hearing transcript. When the court asked Jackson if he "still desire[d] to represent [him]self," Jackson asked for time to consult with Woods. Then Jackson started complaining again about jurisdiction, at which point the district court set a trial date and ended the hearing.

Three months later, in October, Jackson wrote to the district court requesting new counsel once again. Jackson asserted that Woods had not returned to see him and that Woods still refused to file a motion challenging the court's jurisdiction. Jackson reiterated these complaints during a hearing later that month and said that he wanted a new attorney. The court responded that Woods could not control where Jackson was held, and that Jackson could either work with Woods or represent himself, which again the court urged Jackson not to do. Jackson persisted with his jurisdictional theories.

Finally, the court said "the only question you need to answer for me is do you wish to represent yourself or do you wish for Mr. Woods to continue to represent you?" Jackson said he should have more options than to have Woods represent him or represent himself. The district court responded that those were his only two options. Jackson said "I don't want [Woods] on my case." The court replied, "[t]hen you are representing yourself."

Jackson thereafter represented himself at trial. A jury convicted him of all of the charges in the superseding indictment. The district court imposed a sentence of 1,846 months, which was driven largely by a series of mandatory minimums on the gun counts. This appeal followed.

II.

Jackson argues that the district court violated his Sixth Amendment right to counsel when the court denied his motion to appoint another lawyer in place of Woods. We review for an abuse of discretion the district court's refusal to appoint new counsel. *United States v. Marrero*, 651 F.3d 453, 464 (6th Cir. 2011).

A.

When a defendant requests new counsel, the district court must "conduct an inquiry . . . to determine whether there is good cause for substitution of counsel." *United States v. Vasquez*,

560 F.3d 461, 466 (6th Cir. 2009). When reviewing a district court's decision to deny a motion

for substitution of counsel, we consider four factors:

> [1] the timeliness of the motion; [2] the adequacy of the court's inquiry into the defendant's complaint; [3] whether the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense; and [4] a balancing of the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice.

*Marrero*, 651 F.3d at 464.

With respect to the first factor—timeliness—our main concern is how close to trial a

defendant made his motion for new counsel. *See, e.g.*, *United States v. Saldivar-Trujillo*,

380 F.3d 274, 278 (6th Cir. 2004). Here, Jackson first alerted the district court that he was

unhappy with Woods in February 2013—one month after Woods was appointed. Jackson

requested new counsel in April and again in October. His trial was in March 2014. The district

court did not express any concern about the timeliness of Jackson's motions. So Jackson's

motion was timely.

As for the second factor—the adequacy of the court's inquiry into Jackson's

complaints—Jackson had two principal concerns: first, Woods's refusal to file a motion

challenging the district court's jurisdiction in this case; and second, Woods's lack of

communication with him. In both the July and October hearings, the district court allowed

Jackson to go on at great length about Woods's refusal to file a motion challenging jurisdiction.

And in the July hearing the court adequately inquired into Jackson's complaints about his

communication with Woods: the court listened to Jackson's complaints and allowed Woods to

explain why he had not seen Jackson more. In the October hearing, Jackson focused entirely on

Woods's refusal to file a jurisdictional motion, which was an issue as to which the district court had already been more than patient. Hence, this factor weighs against Jackson.

The third factor is the most important: whether Woods's lack of communication was so complete that it prevented an adequate defense. Although Woods visited Jackson only once at his detention center, the record shows that Woods provided Jackson with case law, told Jackson that he would not file meritless motions on his behalf, and discussed Jackson's desire to be transferred closer to Memphis. Woods also filed several motion on Jackson's behalf and met with him at the courthouse at least for times. Thus, there was not a complete breakdown in communication between Jackson and Woods.

The last factor balances a defendant's right to his preferred counsel with society's interest in "the prompt and efficient administration of justice." *Marrero*, 651 F.3d at 464. This factor is a wash: true, Jackson's request for a new lawyer (his third) would not have delayed his trial; but Jackson was not entitled to an unlimited succession of lawyers, particularly since the next lawyer would not have been any more free to file frivolous motions (Jackson's principal complaint about Woods) than Woods was. The district court did not abuse its discretion in denying Jackson's request for yet another new lawyer to represent him.

B.

Relatedly, Jackson appears to argue that the district court "forced" him to represent himself and that his decision to do so, therefore, was not voluntary. After a district court has properly rejected a defendant's request for new counsel, it may leave the defendant with the choice of representing himself or proceeding with his current counsel. *Marrero*, 651 F.3d at 466. In either circumstance, "[t]o ensure that a defendant's waiver of his right to counsel is knowing and intelligent, the district court must ask the defendant a series of questions drawn from, or

substantially similar to the model inquiry set forth in the *Bench Book for United States District Judge.*" *United States v. Heard*, 762 F.3d 538, 543 (6th Cir. 2014) (internal quotation marks omitted). The district court asked Jackson all those questions here, and urged him not to represent himself. And once the district court properly denied Jackson's motion for new counsel, the court could leave Jackson with the choice of representing himself or proceeding with Woods. Jackson's waiver of counsel was knowing and intelligent.

The district court's judgment is affirmed.