RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0173p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————

GRADY BRINKLEY,

  *Petitioner-Appellant,*

*v.*

No. 12-3011

MARC C. HOUK, Warden,

  *Respondent-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:06-cv-110—John R. Adams, District Judge.

Argued: January 13, 2016

Decided and Filed: July 25, 2016

Before: COLE, Chief Judge; ROGERS and KETHLEDGE, Circuit Judges.

———————

**COUNSEL**

**ARGUED:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY F. SWEENEY, Cleveland, Ohio, for Appellant. Jocelyn S. Kelly, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY F. SWEENEY, Cleveland, Ohio, John P. Parker, Cleveland, Ohio, for Appellant. Jocelyn S. Kelly, Brenda S. Leikala, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

———————

**OPINION**

———————

KETHLEDGE, Circuit Judge. Grady Brinkley cut the throat of his 18 year-old girlfriend, Shantae Smith, and then called the local Greyhound Bus terminal and stole her ATM card while, or shortly after, she lay bleeding to death on her apartment floor. An Ohio jury convicted

Brinkley of murder and recommended a sentence of death, which the trial court imposed. The Ohio Supreme Court thereafter affirmed Brinkley's conviction and sentence, and the Ohio courts denied his petition for post-conviction relief. Brinkley later sought federal habeas relief, which the district court denied. We affirm.

I.

On November 6, 1999, Grady Brinkley did not report for his scheduled shift at Rick's City Diner in Toledo, Ohio. Instead, Brinkley persuaded a co-worker, Olivia Hunter, to drive him to the diner about an hour before it closed that afternoon. Then he loitered around for a while. At closing, hostess Marissa Brown put the day's proceeds—$2,211—and a bank-deposit slip into a paper bag, which she put in her purse. Brinkley followed Brown to her car, pointed a silver pistol in her face, and demanded the money. Brown thought he was joking and slapped the gun away. Brinkley punched her in the mouth and cocked the pistol. Brown gave him the money. Brinkley and Hunter then drove off; Brown went back into the diner, her mouth full of blood, and told the cook, "Snoop [*i.e.*, Brinkley] robbed us." The Toledo Police tracked Brinkley without much difficulty and arrested him and Hunter that afternoon.

Brinkley sat in jail for the next several weeks, where he met another inmate, Samuel Miller. Soon Brinkley bragged to Miller about the robbery, saying that "the gun was real." Brinkley, who was then 32, also said he would manipulate his 18 year-old girlfriend, Shantae Smith, to post bond for him, even though (according to Brinkley) she was then "sleeping with" another man. Brinkley added that he would skip town rather than face the robbery charge, that he "was going back home, to Chicago," and that "I'm going to kill that bitch [Smith] before I leave town."

Meanwhile Smith's life changed for the better while Brinkley was in jail. She got a new job, a new apartment, and met new co-workers and friends. She also (as Brinkley surmised) had a new boyfriend, with whom she worked at her new job.

Brinkley's bond was set at $20,000. On December 17, 1999, Smith withdrew $2,000 from her bank account, paid it to a bail-bond company (as their fee), and co-signed a $20,000 bail bond to spring Brinkley from jail. He walked out of jail that afternoon.

Brinkley stayed at Smith's apartment for the next three weeks. On January 6, 2000, Brinkley failed to show at his pretrial hearing. The following morning, after Smith returned home from work, Brinkley strangled her, slit her throat, and then stole her ATM card and winter coat as she bled to death on her apartment floor. Around the same time, Brinkley used Smith's phone to call the local Greyhound Bus terminal, where he soon headed to catch a 6:50 p.m. ride to Chicago. Before getting on the bus, however, Brinkley tried 16 times to use Smith's ATM card. Each time he failed—he did not know her PIN—and video from a camera at one of the ATM machines showed Brinkley wearing Smith's coat (which was much too small for him; Brinkley is 6'4") as he tried to withdraw cash with her card.

At 7 p.m. the following day—after Brinkley had reunited with his own mother in Chicago—Shantae Smith's mother, Theresa, went to Smith's apartment to drop off some laundry. Theresa knocked on the door but no one answered. Theresa pushed open the door as far as its chain would allow and saw blood inside. She kicked open the door and saw a pool of blood next to a pile of blood-soaked sheets and blankets in the kitchen. She pulled back one of the blankets, and saw the body of her daughter. Theresa called the police, who found in the apartment bloody footprints that matched Brinkley's size-15 Nike shoes. They also found a bogus note, written in Brinkley's handwriting (the note bears his thumbprint) but purportedly signed by Smith, which said, "Will be gone to Atlanta for 7 days to see my friend, could you please not fix my sink until I get back."

A brief manhunt followed—as before, Brinkley was easy to find—until, on January 13, an FBI fugitive task force arrested Brinkley at his mother's residence in Chicago. Brinkley wore Smith's winter coat and the same pair of size-15 Nike shoes as he walked to the FBI car.

A grand jury charged Brinkley with robbery, aggravated robbery, and aggravated murder. The indictment also alleged two statutory aggravating circumstances—also known as "death-penalty specifications"—either of which would make Brinkley eligible for the death penalty: first, that he murdered Smith "for the purpose of escaping detection, apprehension, trial, or punishment" for another crime; and second, that he murdered Smith while committing or attempting to commit aggravated robbery. Ohio Rev. Code §§ 2929.04(A)(3), (A)(7).

The trial court appointed attorneys Donald Cameron and Ronald Wingate to represent Brinkley. Both found Brinkley extremely difficult to work with, especially as to the development of "mitigation evidence," *i.e.*, evidence that might suggest a lesser degree of culpability for the crime. (Brinkley apparently regarded discussion of mitigation evidence as a suggestion that he might be found guilty during the trial's liability phase.) Brinkley asked the trial court to appoint him new counsel, which the court refused to do, but then Cameron and Wingate moved to withdraw, citing a breakdown in their relationship with Brinkley. The court granted that motion six months before trial and appointed John Thebes and Merle Dech to represent Brinkley. They likewise found Brinkley to be a difficult client, particularly as to preparation for a potential mitigation phase at trial.

Thebes took the lead in preparing for the trial's liability (*i.e.*, guilty-or-innocent) phase, while Dech handled the mitigation phase. Dech spoke at length with Dr. Jolie Brams, a clinical psychologist whom Brinkley's prior attorneys had retained. Brams had interviewed Brinkley for several hours and, in Dech's view, was not likely to have helpful opinions as to mitigation. Dech decided to get a fresh opinion, so he contacted Dr. Douglas Smith, a forensic psychiatrist. Smith interviewed Brinkley for several hours and verbally reported his impressions to Dech, who at that point chose a different mitigation strategy altogether, namely to emphasize Brinkley's difficult childhood in the projects on the South Side of Chicago and the grief that Brinkley's execution would bring his mother, sister, and aunts. To that end Dech travelled to their homes on Chicago's South Side and met with them for four or five hours.

A jury found Brinkley guilty of all charges, including the death-penalty specifications. During the trial's mitigation phase, the state did not present any evidence. As planned, Dech elicited testimony from Brinkley's sister, aunts, and mother, who at one point broke down during her testimony, causing the court to call a recess. Brinkley also made an unsworn statement. The jury found that the aggravating circumstances outweighed any mitigating circumstances and recommended the death penalty.

The trial court then held a sentencing hearing. Brinkley spoke at some length on his own behalf, quarrelling with newspaper accounts of his trial, claiming that "my counsel did a piss-poor job in representing me" and that "[t]he job they did I could have did in my sleep[,]" and

claiming that his own mother and sister's testimony about his childhood "was a lie, because I did not grow up in poverty." Finally, the trial judge said that he had "looked at the evidence and done my independent reweighing of the aggravating circumstances and mitigating factors." The judge then offered some observations:

> One, you are a manipulative, very cold and calculating individual, and two, you have a very cruel and vicious side to you. That's evidenced by the fact that after Shantae Smith was attempted to be strangled and then her throat was cut, you spent some time in her apartment attempting to access her account and spent some time in that apartment making calls to get out of town while she laid on the floor and, according to the coroner, may have been alive for up to one-half hour while she bled to death. The depth of that cruelty is exceeded only by your cold, calculating, and manipulative behavior.

The judge added:

> [Y]ou are a predator of women, and that's reflected in the evidence in this case and your history. One only needs to look at what you did to this young lady that you worked with when you robbed her at the City Diner, shoving a gun in her face, then cocking it and striking her in the mouth, helpless as she was; your use of the lady who drove you to the City Diner, and the manner in which you used Shantae Smith.

The court then imposed a death sentence on Brinkley. (Just before the court adjourned, Brinkley said on the record to the prosecutors: "Mr. Anderson, Mr. Braun, kiss my ass.")

Brinkley appealed, asserting numerous claims under both state and federal law. The Ohio Supreme Court rejected them all. *State v. Brinkley*, 824 N.E.2d 959 (Ohio 2005). While his appeal was pending, Brinkley filed a petition for post-conviction relief in state court. The trial court and Court of Appeals denied relief. *See State v. Brinkley*, No. L-04-1066, 2004 WL 2384455 (Ohio Ct. App. Oct. 22, 2004). Brinkley also applied to reopen his direct appeal; the Ohio Supreme Court denied his application. *State v. Brinkley*, 835 N.E.2d 379 (Ohio 2005).

Brinkley thereafter filed a habeas petition in federal court. The district court denied relief. This appeal followed.

II.

A.

Brinkley argues that the State's evidence in support of his death-penalty specifications was constitutionally insufficient. The Ohio Supreme Court rejected these claims (one for each specification) on the merits, so the parties agree that our review of the claims is governed by the federal habeas statute, specifically 28 U.S.C. § 2254(d). Per that provision, we may not grant habeas relief on a claim "adjudicated on the merits" in state court unless the state court contradicted or unreasonably applied Supreme Court precedent, or unreasonably determined the relevant facts. *Id.*

Here, the relevant Supreme Court precedent states that we must reject Brinkley's sufficiency claims if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Yet in this case our review is more deferential still: when one combines the *Jackson* standard and the unreasonable-application standard of § 2254(d), the relevant question becomes whether any "fairminded jurist" could conclude that any rational trier of fact could find that the evidence was sufficient to convict. *See Harrington v. Richter*, 562 U.S. 86, 101-02 (2011). So we turn to that question as to each of the specifications.

The first specification is set forth in Ohio Rev. Code § 2929.04(A)(3), which requires a finding that "[t]he offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender." The Ohio Supreme Court held that a rational juror could find for two reasons that Brinkley killed Shantae Smith at least in part to avoid prosecution for the City Diner robbery. The first was that Smith would have a "strong incentive," *Brinkley*, 824 N.E.2d at 972—a $20,000 incentive, to be precise—to notify the police about Brinkley's plans to flee to Chicago, since Smith would be liable for that amount as cosigner of his bail bond. Brinkley responds that the State lacked evidence that Smith would be liable for the bond amount, but the bail bondsperson testified at trial that Smith cosigned

Brinkley's bond.  Suffice it to say that a fairminded jurist could conclude that a rational jury could find that Brinkley killed Smith at least in part to ensure that she would not turn him in.

The Ohio Supreme Court's second reason—that Brinkley needed money for his flight to Chicago, and thus was motivated to kill her to get her ATM card—strikes us as weaker.  True, Brinkley tried to use the card 16 times after he stole it, but his bus ticket to Chicago was already paid for, *see id.* at 968, and he planned to stay with family once he got there.  But we need not decide whether this reasoning is an unreasonable application of *Jackson*, because the Court's first reason is enough to reject Brinkley's (A)(3) claim.

The second specification is set forth in Ohio Rev. Code § 2929.04(A)(7), which requires a finding that "[t]he offense [here, Smith's murder] was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit," among other offenses, aggravated robbery.  Brinkley argues that, for this provision to apply, Brinkley must have murdered Smith in order to rob her (by taking her ATM card and coat).  Brinkley is incorrect:  for this specification to apply, the jury needed to find only that the murder and robbery were "part of one continuous occurrence."  *State v. Osie*, 16 N.E.3d 588, 627 (Ohio 2014).  A rational jury could make that finding here:  Brinkley cut Smith's throat, walked around her apartment while organizing his escape, and took her coat and ATM card on the way out.  Brinkley is not entitled to relief on his sufficiency claims.

B.

Brinkley next argues that the trial court violated his Sixth Amendment rights, among others, when the court limited his cross-examination of Samuel Miller, the cellmate to whom Brinkley had made various self-incriminating statements.  Specifically, Brinkley sought to cross-examine Miller about whether, in return for testifying against Brinkley, Miller had received a lighter sentence on the charges pending against him while he was in jail with Brinkley.  The trial court took Brinkley's argument seriously enough to hold an evidentiary hearing and take testimony from the prosecutor who handled Miller's case.  (That prosecutor was not involved in Brinkley's prosecution.)  Miller's prosecutor testified under oath, however, that Miller had not cut any deal in exchange for Miller's testimony in Brinkley's case, and that he (Miller's

prosecutor) was unaware of Brinkley's case at the time Miller was sentenced.  The trial court thus refused to allow Brinkley to cross-examine Miller about an alleged deal for his testimony because Brinkley lacked any evidence that there had been one.  The Ohio Supreme Court later held that this decision was within the trial court's discretion.  *Brinkley*, 824 N.E.2d at 978-79.

Trial courts have "wide latitude" to impose "reasonable limits" on the scope of cross-examination concerning a witness's potential bias.  *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  We see no misapplication of *Van Arsdall* or any other precedent of the United States Supreme Court here.  Brinkley's claim is meritless.

C.

Brinkley's remaining claim is that his counsel was constitutionally ineffective during the mitigation phase of his trial.  Brinkley had two pairs of appointed counsel during his criminal case.  The first pair, Donald Cameron and Ron Wingate, withdrew from the case because they were unable to work constructively with Brinkley on his defense.  Brinkley now argues that the second pair, Merle Dech and John Thebes, were constitutionally ineffective.  To prevail on that claim, Brinkley must show that his attorneys' performance "fell below an objective standard of reasonableness," and that their performance prejudiced his defense.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  To show prejudice, Brinkley must show a reasonable probability that the jury would not have sentenced him to death if counsel had been competent, *i.e.*, a reasonable probability that at least one juror would have voted against the death penalty. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

As an initial matter, the parties dispute at great length whether our review of this claim is de novo or instead subject to 28 U.S.C. § 2254(d), and whether we may consider only materials in the state-court record or instead may consider evidence gathered in the federal district court as well.  *See generally* 28 U.S.C. § 2254(e).  We bypass these disputes because they make no difference to the outcome here:  even if, as Brinkley requests, we review his claim de novo and consider the evidence gathered in federal court, he still is not entitled to relief.

With the exception of a lesser contention addressed further below, Brinkley's argument boils down to the following:  his lawyers should have done more to prepare for the mitigation

phase of his trial (which goes to the performance element of *Strickland*); and, if they had, they would have been able to show the jury that Brinkley had a traumatic childhood, that he has Narcissistic Personality Disorder, and that he regularly abused alcohol and crack cocaine (all of which goes to the prejudice element).

We consider in turn the three types of evidence (childhood trauma, narcissism, and substance abuse) that Brinkley says his lawyers should have presented but did not. First, Brinkley's lawyers did present substantial evidence of his childhood trauma at trial. The jury heard—from his mother, sister, and aunts—that Brinkley's mother gave birth to him when she was 14, that he grew up amid poverty and violence on Chicago's South Side, that his father was stabbed to death when Brinkley was only seven, and that his mother's second husband often physically abused her in front of Brinkley. Additional evidence of these facts would have been only cumulative. *See Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006). True, the jury did not hear that Brinkley's stepfather also abused him on occasion, and that his grandparents died when he was a child; but even Brinkley gives those only passing mention in his brief, and he offers no reasons (and we see none) as to why, specifically, those facts would have changed the balance at trial. As to childhood trauma, therefore, Brinkley has shown neither deficient performance nor prejudice.

Next is the diagnosis—by Dr. Robert Smith, a clinical psychologist who examined Brinkley for purposes of his state post-conviction proceedings—that Brinkley has Narcissistic Personality Disorder. Brinkley characterizes this condition as a "severe psychiatric condition" that "would have helped explain the criminal activity [*i.e.*, Smith's murder] and humanized [Brinkley] for the jury." Pet'r Br. at 80-81. But here, as in another recent case, Brinkley "seriously misunderstands the nature of [this] diagnosis." *United States v. Heard*, 762 F.3d 538, 542 (6th Cir. 2014). "Personality disorders are not psychoses[,]" and "people with personality disorders are present in all walks of life." *Id.* Narcissists, in particular, "are relatively 'prevalent in professions that are unusually respected, including law, medicine, and science, or those that boast celebrity status, such as entertainment, sports, and politics.'" *Id.* (quoting Millon, et al., *Personality Disorders in Modern Life* (2d ed. 2004) at 333-34)). That Brinkley is a narcissist, therefore, does not "explain" his brutal murder of Shantae Smith; and it was counsel's

prerogative to conclude that Brinkley's narcissism would not make him more sympathetic to a jury. (Quite the contrary, if common experience is any guide.)

Moreover, Brinkley entirely overlooks the evidence to which his narcissism diagnosis would open the door at trial. If Brinkley had put on expert evidence of his psychological condition, the State could have done the same. His counsel were alert to this danger: Dech's notes of his two-hour conversation with Dr. Brams (the psychologist retained by Brinkley's first pair of attorneys) include not only the word "narcissistic" but also the word "psychopath," and Brams herself told Dech that "she would probably be a better witness for the government" than for the defense. In addition, any testifying psychologist would have reviewed Brinkley's history, as Brams in fact did. That history would have been fair game during cross-examination of any psychologist testifying for the defense, and during direct-examination of any such expert testifying for the prosecution. *See State v. Gumm*, 653 N.E.2d 253, 266-67 (Ohio 1995). And that history includes the following: that when Brinkley was ten he broke the arm of a girl the same age with a baseball bat, an action for which, to this day, he shows no remorse; that when Brinkley was 15 he anally raped another girl the same age, and then vaginally and anally raped her with a screwdriver; and that Brinkley boasted of his ability to manipulate women for his own purposes. That history, when combined with the circumstances of Smith's murder, in turn presented the possibility, if not the likelihood, that any witness testifying as to Brinkley's psyche would opine that he was not only a narcissist, but a psychopath. And *that* diagnosis would explain his "criminal activity" in a way decidedly unhelpful to his cause at trial. Indeed it would have only confirmed the truth of what the trial judge said when he imposed a sentence of death. Brinkley's lawyers had good reasons not to start a battle of psychological experts at trial, and their decision not to have that battle was neither deficient performance nor prejudicial within the meaning of *Strickland*.

That leaves the omission of any testimony at trial concerning Brinkley's abuse of alcohol and crack cocaine. Brinkley cites *Rompilla v. Beard*, 545 U.S. 374 (2005), for the proposition that this omission was ineffective assistance. In *Rompilla*, the Court did say that the defendant's "history of dependence on alcohol . . . might have extenuating significance." *Id*. at 383. But the Court expressly declined to say that counsel's failure to investigate that history of alcohol

dependence was deficient performance when the defendant himself interfered with the mitigation investigation—as by all accounts Brinkley did here. *Id.* And otherwise courts have "repeatedly" held in capital cases that evidence of the defendant's substance abuse "often can have a distinctly double-edged nature to it: whatever mitigating effect such evidence might have had if presented, it is just as likely the jury would have reacted negatively to it." *Wackerly v. Workman*, 580 F.3d 1171, 1178 (10th Cir. 2009) (internal quotation marks omitted). Brinkley provides no reason to think that his use of alcohol and crack would have elicited a positive reaction from the jury here. His argument is meritless.

Separately—and finally—Brinkley argues that counsel should have elicited testimony from Dan Swets, the chaplain at a jail in Illinois where Brinkley was incarcerated. According to Brinkley, Swets could have testified that Brinkley pledged his life to God while in jail and was a mentor of sorts to other inmates. Dech ultimately chose not to call Swets, however, because he feared that doing so would open the door to questions about Brinkley's criminal past. Again we see no reason why that decision was deficient or prejudicial to Brinkley's defense.

In sum, the record reveals little that one could say in mitigation of Grady Brinkley's murder of Shantae Smith. And what little one could say, was largely said.

\* \* \*

The district court's judgment is affirmed.