**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0567n.06

Case No. 19-6187

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Oct 06, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| STEPHEN PATTERSON, JR., | ) | KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: ROGERS, SUTTON, and STRANCH, Circuit Judges.

SUTTON, Circuit Judge. After assaulting his girlfriend, Stephen Patterson was arrested, and the police found a loaded gun on him, prompting a felony possession charge. Patterson represented himself at trial, and a jury found him guilty, leading to a ten-year sentence. On appeal, he claims that he was incompetent to stand trial and to represent himself. The district court disagreed, relying on a forensic psychologist's report and its own observations of Patterson. We affirm.

In February 2017, Nicole Nichols returned home to see her boyfriend, Patterson, sitting on the floor and acting "strangely," "like an animal." R. 123 at 104, 131–32. He went from acting strangely to becoming violent. After first striking objects in the house, he hit Nichols. Then it got

worse. He grabbed her by the neck, held a gun to her head, and told her that she "should die" and "didn't deserve to live." *Id.* at 132. Nichols escaped and called 911.

Patterson surrendered to the police. They searched him and discovered a loaded pistol in his pocket. Patterson admitted that the pistol was his and acknowledged that he had been "smoking a lot of spice"—synthetic marijuana. *Id.* at 88. At the station, Patterson became violent and had to be subdued by a police dog. In response, Patterson bit the dog "because th[e] dog bit me and that was the only way to defend myself." R. 120 at 8.

Indicted for being a felon in possession of a firearm, Patterson gave some odd statements at his initial appearance. Asked whether his name was Stephen Patterson, he replied: "That name belongs to the United States of America." R. 126 at 6. After probing by the court, he said, "I was a representative of or agent of Mr. Patterson, which I wish no longer to be a representative of." *Id.* at 6–7. Patterson's attorney moved for an evaluation of whether he was competent to stand trial.

Dr. Allison Schenk, a psychologist with the Federal Bureau of Prisons, examined him. Based on five clinical interviews and several meetings, the observations of other prison staff, and camera footage of Patterson's arrest, Dr. Schenk concluded that Patterson was "competent to proceed with his legal case" and did "not have a severe mental disease or defect that would have an adverse impact on his ability to reason." *Id.* at 12. She found that Patterson's answers at the first hearing reflected an effort not to cooperate. As for Patterson's behavior during the arrest, Dr. Schenk concluded it was most likely "volitional . . . [or] related to concurrent substance abuse," pointing out that it would be "highly unusual" for "an individual to have a psychotic break at the specific moment of a criminal offense having never had any psychotic episodes before and not having any thereafter." R. 57 at 16, 20. The court agreed. Even though "Patterson holds unusual

beliefs, and has engaged in unusual behavior," it found, "he is fully capable of rationally understanding the proceedings against him . . . [and] assisting in his defense." R. 32 at 6.

Patterson chose to represent himself. At trial, Patterson claimed the gun was planted on him by Nichols or the officers. The jury found him guilty, and he was sentenced to ten years.

*Competence to stand trial.* A criminal defendant may not be put on trial if he is incompetent. *Drope v. Missouri*, 420 U.S. 162, 171, 180–81 (1975). Eligibility for the defense requires the individual to show he has a mental illness that renders him "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(d). "Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." *Godinez v. Moran*, 509 U.S. 389, 402 (1993). A defendant is not necessarily incompetent even if he "suffer[s] from [a] severe mental illness." *Indiana v. Edwards*, 554 U.S. 164, 178 (2008). All in all, incompetence is a "high" bar, heightened by clear-error review on appeal. *United States v. Dubrule*, 822 F.3d 866, 876 (6th Cir. 2016).

No error occurred, let alone a clear one. Drawing on her expertise and interviews with Patterson, Dr. Schenk found him competent and "not experiencing any symptoms of a mental illness." R. 25 at 12. Patterson, she found, understood the nature and consequences of the proceedings against him. During interviews, he identified the charged crime, the potential ten-year sentence, the role of the various players in the process (defense counsel, prosecutor, judge, witnesses, and jury), and the consequences of pleading (or not pleading) guilty. As for Patterson's ability to assist in his defense, he expressed willingness to work with his court-appointed attorney and "described appropriate strategies for resolving any disagreements" they might have. *Id.* at 12. He also communicated effectively with Dr. Schenk, providing coherent answers to her questions,

using normal speech patterns, and retaining and applying information. Patterson assessed a series of hypothetical criminal fact patterns and ultimately applied them to his own case, "identify[ing] pieces of evidence and witnesses . . . [and] evaluat[ing] the relative strength or weakness of that evidence," providing "logical, well-reasoned, and rational" answers. *Id.* at 11. Dr. Schenk's opinion amply supports the competency finding. *See United States v. Heard*, 762 F.3d 538, 541–42 (6th Cir. 2014). Patterson to this day has not identified an expert who has a contradictory view of his competence to stand trial.

The district court's on-the-scene observations confirmed Dr. Schenk's assessment. The court asked Patterson a series of questions about his background, the crime, the proceedings, even his reading interests. Through it all, Patterson's answers were "calm, thought out, and articulate." R. 32 at 6. Patterson correctly identified the crime he was charged with: "I know [the government is] saying I had some ammunition and a handgun." R. 57 at 49. He understood the attorney-client privilege and refused to waive it. Patterson gave no indication he could not or had not communicated effectively with his attorney, and his effective communication at the hearing strongly suggested just the opposite.

Nothing that happened after the competency hearing gave the trial court "reasonable cause" to call that conclusion into question. 18 U.S.C. § 4241(a); *Drope*, 420 U.S. at 181. Patterson provided a coherent reason for removing his court-appointed attorney: tactical disagreements. He evaluated the plea deal and reviewed the evidence. He participated in a bench conference about jury selection and removed several potential jurors with peremptory strikes. At trial, he had a clear and consistent defense, which he frequently articulated and pressed during cross-examination. Through it all, Patterson followed the rules about as well as can be expected of a layperson, all while interacting courteously with the court, prosecutor, jury, and witnesses. Patterson, in short,

4

"knew what was going on" and was not incompetent. *United States v. Coleman*, 871 F.3d 470, 477 (6th Cir. 2017); *United States v. Tucci-Jarraf*, 939 F.3d 790, 796 (6th Cir. 2019).

Patterson tries to counter this conclusion by highlighting his "antisocial personality disorder" based on his "long-standing pattern of violating the rights of others or the laws and norms of society," and his tendencies towards aggression and deceit. R. 57 at 9. But in making that diagnosis, Dr. Schenk noted that antisocial personality disorder generally does not affect a defendant's "competency-related abilities," and Patterson's disorder was no exception. R. 57 at 11. Regrettably, "antisocials fill the nation's prisons." *Heard*, 762 F.3d at 542.

Patterson adds that his former attorney believed he was incompetent. Even though courts may consider an attorney's opinion as "one factor," *United States v. Tucker*, 204 F. App'x 518, 520 (6th Cir. 2006), that factor is outweighed in this instance by the opinions of an expert psychologist and a neutral judge. Note too that Patterson's attorney could not "find[] a doctor that agree[d] with [her]." R. 107 at 2.

Patterson says "[t]he record is filled with examples" of his "bizarre demeanor and irrational behavior." Appellant Br. 22. Doubtless true. But the examples do not by themselves establish incompetence. Take Patterson's actions the night of his arrest, whether acting like an animal or the newsworthy act of biting a dog. Dr. Schenk laid this behavior at the feet of the drugs he consumed. It's hard for Patterson to quarrel with this explanation today, as it's the one he gave that night—that he had smoked "[t]oo much" spice. R. 123 at 125. Drug-induced eccentricities generally do not make someone incompetent to stand trial after the drugs wear off. Consider *Dubrule*. The defendant was arrested for driving while intoxicated on prescription drugs, and made "bizarre statements," including that he was a "world-famous physician," the government

was "trying to kill him," and the government caused hurricane Katrina. 822 F.3d at 871. We affirmed that competency finding. Ours is the easier case.

Patterson adds to the mix some statements he made after the arrest that seemed disconnected with reality. During an interview and at the competency hearing, Patterson was reluctant to use his name, instead calling himself a "vice generate . . . [an] overseer, leader, [or] king" sent by God to "oversee the earth." R. 25 at 6. Patterson also claimed to "hear voices" with suggestions for self-improvement: "Sometimes it might tell me to be silent, you know. Sometimes it might tell me to better yourself, you know, work on your growth as, you know, a natural being." R. 57 at 43–44. These statements don't do the trick either. As Dr. Schenk explained, true delusional beliefs are "well defined" and "pervasive," and Patterson's were not. R. 57 at 54. For instance: Patterson used the "vice generate" label once during the interviews, otherwise "consistently respond[ing] to and identif[ying]" himself as Stephen Patterson, something "a genuine[ly] delu[ded]" person could not do. R. 25 at 10. Plus, Patterson's "unorthodox belief[s]" did not rise to the level of genuine delusions, and Patterson denied hearing voices during four of his five interviews with Dr. Schenk. R. 57 at 54.

No less importantly, "idiosyncratic actions and unconventional beliefs" by themselves do not establish incompetence. *Tucci-Jarraf*, 939 F.3d at 796. They do little to answer the question at hand, whether the defendant understands the proceedings against him and has the wherewithal to support a defense. *See id.*; *Heard*, 762 F.3d at 542. Even assuming Patterson had delusions and heard voices, Dr. Schenk explained, he did not describe anything that would have "impacted his competency-related abilities." R. 57 at 56. Patterson understood the proceedings against him and could support his defense. *See Coleman*, 871 F.3d at 475–76.

Patterson insists he had trouble helping the defense, claiming not to remember much of the incident, giving verbose answers to his lawyer's questions, disagreeing with her strategic decisions, and being skeptical whether she worked for him rather than the government. None of this establishes incompetence. Memory loss does not rise to the level of mental illness, and Patterson never claims it does. As for Patterson's difficulties with his lawyer, he is asking the wrong question. The question is whether the defendant "is capable of working collaboratively with his attorney," not whether he chose to do so. *Heard*, 762 F.3d at 542; *Coleman*, 871 F.3d at 478. Patterson was more than capable of effective communication, as Dr. Schenk explained and as Patterson himself showed through his communications with the court and opposing counsel. "[A] defendant is not rendered incompetent to stand trial merely because he cannot get along with his counsel or disapproves of his attorney's performance." *United States v. Miller*, 531 F.3d 340, 349 (6th Cir. 2008). Nor is he incompetent because he believed players in the criminal justice system were conspiring against him. *See Heard*, 762 F.3d at 542.

*Competence to self-represent.* Patterson separately claims that, even if he was competent to stand trial, the district court should not have let him represent himself. A court may permit an individual to represent himself if (1) he knowingly and voluntarily waives his right to counsel, and (2) he has the "mental competence to quarterback his own defense." *Tucci-Jarraf*, 939 F.3d at 794. Patterson challenges only the second element.

As to the second element, however, the Court has indicated that a defendant competent to stand trial is necessarily competent to represent himself. *Godinez*, 509 U.S. at 399. Cases in our circuit, and others too, have suggested the same. *See, e.g.*, *United States v. Gooch*, 850 F.3d 285, 289 (6th Cir. 2017); *Tucci-Jarraf*, 939 F.3d at 796; *United States v. Bernard*, 708 F.3d 583, 590 & n.11 (4th Cir. 2013) (collecting cases).

Patterson says that *Edwards* establishes that, in view of the difficulties of conducting a trial defense, a court must meet a higher standard of competence to permit self-representation. 554 U.S. at 164. We have our doubts: *Edwards* granted *permission* to impose counsel on defendants competent enough to stand trial but not competent enough to represent themselves. *Id.* at 174. It did not *require* counsel in those circumstances. "Although trial judges *may* from time to time impose counsel on mentally-compromised defendants just competent enough to stand trial . . . they aren't *required* to paternalize defendants in this way." *Tucci-Jarraf*, 939 F.3d at 796.

At any rate, Patterson satisfies the higher *Edwards* standard. To recap: Patterson effectively pursued pre-trial discovery, removed potential jurors with peremptory strikes, participated in bench conferences, had a consistent defense that he pressed through cross-examination, and through it all followed the rules about as well as can be expected of a layperson. All of that, plus Dr. Schenk's report and the district court's record-supported observations, confirm that Patterson was fully "competent to conduct trial proceedings" under *Edwards*. 554 U.S. at 178.

Patterson adds that *Westbrook v. Arizona* requires district courts to conduct a separate hearing to determine a defendant's competence to represent himself. 384 U.S. 150 (1966) (per curiam). But in *Westbrook* the problem was not competence; it was that the trial court never "inquir[ed]" into whether the defendant had made a knowing and intelligent waiver. *Id.* at 150. In the words of *Godinez*, "*Westbrook* stands only for the unremarkable proposition that when a defendant seeks to waive his right to counsel, a determination that he is competent to stand trial is not enough; the waiver must also be intelligent and voluntary before it can be accepted." 509 U.S. at 401–02. No one disputes that Patterson's waiver was intelligent and voluntary here. *Westbrook* is beside the point.

We affirm.