RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0238p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v*.

WILLIAM PRIGMORE,

*Defendant-Appellant*.

> No. 20-3989

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:17-cr-00187-1—Walter H. Rice, District Judge.

Decided and Filed:  October 12, 2021

Before:  BATCHELDER, LARSEN, and READLER, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:**  Steven R. Jaeger, THE JAEGER FIRM PLLC, Erlanger, Kentucky, for Appellant.
Brent G. Tabacchi, UNITED STATES ATTORNEY'S OFFICE, Dayton, Ohio, for Appellee.

_____

**OPINION**

_____

LARSEN, Circuit Judge.  A jury convicted William Prigmore of possessing a firearm as a felon and possessing ammunition as a felon, both in violation of 18 U.S.C. § 922(g).  The district court sentenced him to 120 months' imprisonment.  Prigmore challenges his conviction and sentence on appeal.  For the reasons that follow, we AFFIRM.

I.

A.

In the evening hours of October 21, 2017, a Xenia Police Department (XPD) dispatcher contacted patrol officer Chris Reed about possible drug use at a nearby apartment complex. An anonymous caller had reported that a silver or tan "Ford Explorer-type" vehicle was double parked at the complex and the person in the backseat was "shooting up." Upon arriving at the complex, Officer Reed observed a metallic-colored Hyundai Santa Fe—i.e., a mid-size SUV—straddling the line between a standard parking spot and a handicap-only space. Officer Reed parked his patrol car approximately twenty feet away and shined his spotlight on the Santa Fe. The SUV was not displaying a handicap placard or license plate, meaning it was illegally parked.

As Officer Reed exited his vehicle, Prigmore began to exit from the rear passenger door of the Santa Fe. Officer Reed instructed Prigmore to stay in the vehicle; he complied but left the car door open. Officer Reed approached the passenger side of the Santa Fe, as was his practice for traffic stops, and saw what appeared to be a handgun in the pocket of the rear passenger door, so he activated his body camera, unholstered his firearm, and ordered the vehicle's occupants to raise their hands.

Officer Reed secured the gun and passed it to XPD Sergeant Cvitkovich, who had recently arrived on scene. Although Prigmore told the officers the gun was not real, neither officer inspected it at that time. Officer Reed ordered Prigmore out of the vehicle and handcuffed him. With the Santa Fe door open and Prigmore out of the vehicle, Officer Reed observed a second firearm on the seat where Prigmore had been sitting. Officer Reed secured the second gun, immediately discerning that it was real; once the scene was secure, he learned that the first was actually a BB gun. Law enforcement took Prigmore into custody.

Prigmore was released on bond the next day. His release didn't last long. On October 23, 2017, federal agents arrested Prigmore on suspicion of drug trafficking. The agents did not interview or Mirandize Prigmore immediately because he appeared to be "under the influence of some sort." Local police transported Prigmore to a nearby jail, about a twenty-five-minute trip. Special Agent Patrick Gragan accompanied Prigmore to booking, where he asked Prigmore for

biographical information—his date of birth, Social Security number, and the like. Agent Gragan testified that, by this time, Prigmore appeared coherent: he walked under his own power, spoke in complete sentences, and answered the booking questions without difficulty. Agent Gragan did not ask Prigmore about the criminal allegations against him during this process, but at one point Prigmore stated—unprompted—"that gun was mine."

Later that day, federal officers executed a search warrant for one of Prigmore's residences. They sought evidence of a drug trafficking conspiracy, *see* 21 U.S.C. § 846, including firearms and ammunition. And they found what they were looking for: a box of ammunition in the drawer of an end table.

B.

A federal grand jury indicted Prigmore on one count of possessing a firearm as a felon and two counts of possessing ammunition as a felon, all in violation of 18 U.S.C. § 922(g)(1). Prigmore retained lawyer Nicholas Gounaris for his defense, and so began Prigmore's volatile relationship with his attorneys. Just under a month into the job, Gounaris moved to withdraw after Prigmore filed a baseless ethics complaint against him. Noting the "irretrievably sundered" attorney–client relationship, the district court permitted Gounaris to withdraw and appointed Jeffrey McQuiston in his stead.

Despite his best efforts, McQuiston didn't fare much better. At Prigmore's arraignment the next week, McQuiston noted that he and Prigmore had "gotten off to a rather rocky start." After addressing two matters that Prigmore had personally raised, the court asked if there was anything further; Prigmore, apparently agitated, responded: "I'm listening. No. I said it. No. I can't get it, man. I can't get it. I can't get it. I don't know. No. . . . I'm missing something. I don't know what I'm missing. I don't know." The court encouraged Prigmore to work with his attorney and adjourned.

Matters only got worse from there. McQuiston twice moved to withdraw after Prigmore threatened to report him to the state bar for alleged ethical violations. McQuiston's motions prompted the court to ask McQuiston and the prosecutor for their views on Prigmore's mental competency. McQuiston explained that Prigmore exhibited wild mood swings: "He's a bright

individual.  On a good day, he's cooperative.  On a bad day he is intolerable."  The district court and prosecutor agreed.  The prosecutor added that, from his experience, "Mr. Prigmore one minute was very cooperative.  He's obviously very smart.  Then the next minute would just start saying what I can only say are wild fantasies. . . . How much of that is mental health issues and how much of that is Mr. Prigmore trying to spin things to stir the pot I don't know."  Based on those assessments, the court referred Prigmore for a mental-competency evaluation.

At a hearing later that afternoon, the judge began by asking Prigmore why he thought McQuiston had moved to withdraw.  Prigmore responded bluntly:  "I can be hard to deal with at times, sir."  He then insisted that he "just want[ed] to plead guilty today" because he had "wasted enough of the taxpayer[s'] money."  The judge rejected Prigmore's request, explaining that he was not sure Prigmore was mentally competent to enter a guilty plea, and granted McQuiston's motion to withdraw.

Dr. Shawn Channell, a forensic psychologist with the Bureau of Prisons, evaluated Prigmore and concluded that he was competent to stand trial.  Dr. Channell and his team observed Prigmore over the course of several weeks, interviewed him multiple times, administered intelligence and personality tests, and reviewed court and medical records.  Dr. Channell diagnosed Prigmore with Antisocial Personality Disorder (APD), explaining that APD-afflicted individuals exhibit "a marked disregard for social standards and values" and are "unwilling to accept responsibility for their own behavior."  But that diagnosis did not amount to incompetence.  To the contrary, Dr. Channell reported that Prigmore understood the charges against him and could explain matters to his attorney.  And when asked whether he could compose himself during court proceedings, Prigmore responded that he knew he was expected to be respectful, but he would "act however [he] got to act to get [his] point across and [he] don't give a f*** what anyone says about it."  Significantly, the report concluded that Prigmore was "not willing to work with an attorney who does not conform to [his] expectations [about his defense].  While his expectations may be unrealistic, possibly even not in his best interest, they are not the result of a mental illness.  He is fully capable of working with an attorney if he chooses to do so."

Dr. Channell's conclusion "shock[ed]" the district court. The government was surprised too—so much so that it asked the court for a hearing to allow the parties to cross-examine Dr. Channell. The court granted the government's request and held an evidentiary hearing.

Dr. Channell's testimony elucidated his report. While he was by no means reticent to find a defendant incompetent, having done so in approximately 25% of his more than 500 evaluations, his opinion was firm: APD alone isn't the same as incompetence. Dr. Channell acknowledged that a person with APD might have difficulty working effectively with his attorney, but he was careful to differentiate between willingness and ability:

> I don't believe [APD] impacts their ability. It is a rational choice that they make on their part. It's not like a mental illness. Schizophrenia, for example, in which there is a clear impairment in thinking which prevents the person from having certain beliefs or behaving in certain ways. A person with antisocial personality disorder is aware of the consequences of their behavior and is aware that they could choose to approach it in a different way. They simply choose not to.

Prigmore's (now third) lawyer, Larry Greger, raised the concern that someone with APD would "continue[] to deny the truth of that which the evidence shows is true," interfering with his ability to reasonably assist his lawyer. Dr. Channell allayed that fear too: "Denying a fact that is true is simply a lie. . . . [E]veryone is capable of lying. That's not an indication of mental illness." Based on Dr. Channell's report and testimony, and the court's own observations, the court declared Prigmore competent to stand trial.

After the competency evaluation, things seemed to be looking up. Prigmore worked with Greger to file several motions to suppress and a motion to dismiss for a speedy-trial violation. Greger reported that "[s]o far" he had "a fairly cordial relationship" with Prigmore. And after Prigmore told Greger he wanted to change his plea to guilty, the district court set a date for a change-of-plea hearing.

The plea change was a ruse. As soon as proceedings commenced, Prigmore asked to address the court. He briefly apologized for his "shenanigans," then engaged in a lengthy monologue proclaiming his innocence. After a brief recess, Greger moved to withdraw because he had "been misled" by his client. The court declined to accept Prigmore's "plea" and moved the proceedings to chambers where it acknowledged that Prigmore had duped Greger into an

appearance so he could assert his innocence. Noting again that he was "somewhat shocked that [Prigmore] was declared . . . competent," the judge again asked for the lawyers' opinions on Prigmore's mental competence. The prosecutor expressed concern over Prigmore's ability to aid his lawyer and relayed that, according to the marshals, Prigmore had been throwing feces in jail. Greger agreed, and the court added that "if this is a personality disorder, this is the worst I've ever seen."

The court therefore ordered a second competency evaluation. The judge asked Dr. Kara Marciana, a local forensic psychologist, to evaluate Prigmore and stated that, in his "layman's diagnosis," Prigmore was "nuts." Dr. Marciani evaluated Prigmore and performed several tests. Her conclusions aligned with Dr. Channell's: Prigmore was competent to stand trial and had APD. Dr. Marciani admitted that Prigmore's antics would "likely make[] him a difficult client to work with," but rejected the notion that his behavior stemmed from mental illness. In short, Prigmore understood the proceedings and could assist in his defense if "he cho[]se to do so."

The court was again surprised: "If this weren't the second consecutive mental status evaluation that basically said his only problem is an antisocial personality, I would question the result." The prosecutor agreed, noting that Dr. Marciani's report was "an eye opener in terms of mental health evaluations. The conclusions they reach I think are sound but just seeing Mr. Prigmore in court I honestly don't know how counsel deals with it on a level that's actually allowing them to be effective." Despite the court's concerns, it deferred to the experts' opinions and continued toward trial.

C.

Before trial, Prigmore moved to suppress three key pieces of evidence: the gun found in the Santa Fe, his admission at booking that "that gun was mine," and the bullets recovered from his residence. The district court denied each motion. To start, the court credited Officer Reed's testimony that he couldn't immediately discern that the BB gun was not a real firearm, so the court concluded that Officer Reed had acted reasonably in ordering Prigmore out of the car, and then simply saw the second gun in plain view. The court then held that Prigmore's statement did not implicate the *Miranda* doctrine at all since it was spontaneously made and voluntary.

Finally, the court concluded that the search warrant for Prigmore's home was supported by probable cause and sufficiently particular.

D.

The case proceeded to trial. The presentation of the evidence was fairly unremarkable, but one thing stands out: Against the advice of counsel, Prigmore took the stand in his own defense. On direct, he testified that he had been advised by his former attorney that he had immunity from prosecution for all nonviolent crimes due to his work as a confidential informant. The problem for Prigmore was that no evidence, other than his testimony, suggested such an agreement ever existed. To the contrary, every supposed witness to the "deal" denied its existence, leading the court to eventually conclude "by proof to an absolute certainty that there was no deal."

Things got worse for Prigmore on cross when he openly confessed to the charges:

Q:      Now, on October 21st, 2017, in the back seat of that SUV—correct?

A:      Correct.

Q:      All right. And that Hi-Point firearm was underneath of you, correct?

A:      Correct.

Q:      That was your gun, wasn't it?

A:      Correct.

Q:      The ammunition inside of it was yours, correct?

A:      Well, the—I purchased the gun, so the ammunition come with the gun. It was my gun. You thought I was going to lie. I'm not going to lie.

After a short deliberation, the jury found Prigmore guilty on all counts.

E.

At his initial sentencing hearing, the district court gave Prigmore an opportunity to explain his immunity theory in detail. It wasn't long before the far-fetched turned to the bizarre. After declaring that his former attorney Nick Gounaris had given him "permission to sell drugs" (a claim Gounaris denied under oath), Prigmore stated that he wanted to sell drugs "to get addicts off of the needle." When the judge asked Prigmore to elaborate on this perplexing statement, he

relayed an incomprehensible analogy involving a sixth-grade classroom and a substitute teacher, and then stated that he was helping addicts by selling them pharmaceuticals—"a safer drug" that "you can't overdose on." Prigmore also informed the court that he had filed a complaint with the state bar against Gounaris, accusing the attorney of having sex with him and his girlfriend, a belief which he then attributed to his months in solitary confinement: "[M]y mind washes, wanders, goes back and forth. . . . [A]t one point in time I really thought that, because of blackouts, I don't know. I thought he was trying to kill me. I thought all types of stuff was going on."

Based on these, and other, peculiar statements, the court asked Dr. Marciani to conduct a follow-up competency evaluation. After reviewing hearing transcripts and letters Prigmore had sent to the court, Dr. Marciani confirmed her initial diagnosis:

> The content of Mr. Prigmore's writings and testimony is provocative and contains themes that are attention grabbing. They subsequently create the impression that he is divorced from reality. His claims nevertheless do not reflect the presence of an underlying psychotic thought process. They . . . are not delusional. They instead are consistent with an attempt to manipulate the system to achieve a desired outcome.
>
> . . . .
>
> Manipulation to the aforementioned degree is undoubtably remarkable. However, it does not reflect the presence of an underlying mental disease. It instead is illustrative of Mr. Prigmore's previously assigned diagnosis of [APD]. He accordingly is willing to say anything, no matter how outlandish, in an attempt to get his needs met. The tenacity Mr. Prigmore exhibits with regard to advancing his assertions, while also remarkable, further fails to represent a mental disease. It instead reflects an attempt to wear people down.

The court thus went forward with sentencing, and Prigmore's erratic behavior continued. In a second sentencing hearing, the court permitted Prigmore to examine three corrections officers and extended him considerable leeway to ask them outlandish questions. The court also permitted Prigmore to call his father to the stand. When the judge asked Prigmore's father about his son's mental health, he responded frankly: "Your Honor, in my humble opinion [Prigmore] has no place in civilian population. . . . [I]t hurts to say it but I don't want you letting him out. . . . [H]e's incapable of change."

At a final sentencing hearing, the court determined that Prigmore faced a Sentencing Guidelines range of 84 to 105 months' imprisonment on each count.[1]  The court then turned to the sentencing factors under 18 U.S.C. § 3553(a).  Addressing Prigmore's mental health, the judge noted that, in his "total layman['s]" opinion, Prigmore was "psychotic," but that his view was "apparently mistaken" since "[n]one of the doctors agreed."  He also explained that he regretted the APD diagnoses because "psychosis . . . could have been ameliorated with medication"; "an antisocial personality is a much, much, much harder matter to treat."  In the end, the court concluded that "Prigmore was successful in[] fooling the [c]ourt into thinking he was psychotic but not successful in fooling the mental health professionals."

The court then recounted Prigmore's extensive criminal history—twenty-eight felonies including the two counts of conviction—and the forensic psychologists' conclusions that Prigmore was at a high risk of reoffending, adding that it had "never once heard [Prigmore] say he realizes he has a problem."  Indeed, the court expressed skepticism that Prigmore would seek or cooperate with treatment for his personality disorder, but "[t]hat simply increases . . . his danger to the community," a factor which "outweighs [every other] factor[] either singly or in combination."  Greger objected that Prigmore's mental illness might not "allow him to admit that he's in need of help."  The court replied that "[w]hether he's able to admit it or not . . . the fact remains that increases the recidivism risk, it increases the danger to the community."  The court therefore imposed concurrent sentences of 120 months' imprisonment on count one and 105 months' imprisonment on count two.

II.

Prigmore attacks his conviction and sentence on three grounds.  First, he argues that the district court erred in finding him competent to stand trial.  Second, he contends that the court should have granted his motions to suppress.  Finally, he asserts that his sentence is substantively unreasonable.

---

[1]At sentencing the government dismissed the ammunition charge related to the XPD encounter to avoid multiplicity problems.

A.

We begin with Prigmore's competence. "A defendant's competence is a question of fact, which we review for clear error." *United States v. Dubrule*, 822 F.3d 866, 875 (6th Cir. 2016) (quotation marks omitted). We will not reverse the finding unless "on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). "[T]he bar for incompetency is high: a criminal defendant must lack either a 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' or 'a rational as well as factual understanding of the proceedings against him.'" *United States v. Miller*, 531 F.3d 340, 350 (6th Cir. 2008) (quoting *Drope v. Missouri*, 420 U.S. 162, 172 (1975)). "In determining whether a defendant is competent, a court should consider evidence of irrational behavior, the defendant's demeanor at trial, and any prior medical opinion concerning competence to stand trial." *United States v. Coleman*, 871 F.3d 470, 475 (6th Cir. 2017).

We see no error in the district court's competency finding, let alone clear error. The court relied on the unanimous conclusions of three mental health evaluations in finding Prigmore competent. We have upheld competency findings on far thinner records. *See Dubrule*, 822 F.3d at 876–77 (affirming competency finding against contrary opinion of defendant's attorney and two out of three experts).

Prigmore does not challenge the conclusions of the medical competency evaluations on appeal. Instead, he contends that the district court should have ignored the experts' conclusions in light of the lay opinions of Prigmore's lawyers, the prosecutor, and the judge. We disagree. Each of these individuals indeed expressed concerns about Prigmore's competency, but the district court on every occasion responded "cautious[ly] and deliberate[ly]." *United States v. Davis*, 515 F. App'x 486, 493 (6th Cir. 2013). After the hearing on McQuiston's motions to withdraw, the district court ordered a competency evaluation *sua sponte*; when the parties were "shock[ed]" by Dr. Channell's conclusion, the court held a competency hearing; after Prigmore duped Greger with the change-of-plea ruse, the court again ordered a competency assessment—this time from a different psychologist; and after Prigmore lodged wild accusations and frivolous

theories at his initial sentencing hearing, the court ordered *another* psychological evaluation. After three evaluations, the court was able to square Prigmore's behavior with the experts' opinions: Prigmore had "fool[ed] the Court into thinking he was psychotic but not . . . the mental health professionals." In short, "any cause for concern about [Prigmore]'s competency was dissipated by the results of the competency examination[s]." *United States v. Heard*, 762 F.3d 538, 542 (6th Cir. 2014) (quotation marks omitted).

Our caselaw is replete with instances of criminal defendants who exhibited bizarre behavior, but who nonetheless met the Constitution's competency standard. *E.g.*, *United States v. Tucci-Jarraf*, 939 F.3d 790, 792–93 (6th Cir. 2019) (defendants asserted that "United States courts cannot hold anyone 'except by their own consent'" and "mailed the court an itemized bill seeking payment of over $46 quintillion dollars"); *Coleman*, 871 F.3d at 472 (defendant claimed that a "Common Law Copyright Notice" on his name obligated the court to pay him every time it used his name); *Dubrule*, 822 F.3d at 871 (anti-Semitic rants and conspiracy theories). In some of those cases, that behavior apparently stemmed from severe personality disorders. *E.g.*, *Dubrule*, 822 F.3d at 874. But our caselaw repeatedly emphasizes that even a severe personality disorder is not alone sufficient to make one legally incompetent to stand trial. *Heard*, 762 F.3d at 542 (upholding decision not to order competency evaluation after defendant was diagnosed with "Narcissistic, Paranoid, and Antisocial Personality Disorders"); *accord United States v. Gabrion*, 719 F.3d 511, 533 (6th Cir. 2013) (en banc) (affirming competency finding for defendant with "Histrionic or Antisocial personalit[y]"); *Davis*, 515 F. App'x at 493 (same for defendant with APD). So too here. Three medical evaluations attributed Prigmore's behavior to severe APD yet concluded that he had the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam). The district court did not clearly err in relying on those results.

Prigmore also asserts that his decision to testify at trial against counsel's advice demonstrates that he was so unable to assist in his own defense as to be legally incompetent. But that decision demonstrates Prigmore's unwillingness to work with his attorney, not his inability to do so—a conclusion consistent with his APD diagnosis. "Competency requires only 'the

ability' to consult with one's attorney; it does not require the defendant to do so in every instance." *Dubrule*, 822 F.3d at 877 (quoting *Dusky*, 362 U.S. at 402); *see also Miller*, 531 F.3d at 349 ("[A] defendant is not rendered incompetent to stand trial merely because he cannot get along with his counsel or disapproves of his attorney's performance."). As Dr. Channell noted, Prigmore could work effectively with his attorney "if he cho[]se[] to do so."[2] The district court therefore did not err by finding Prigmore competent to stand trial.

### B.

Prigmore next argues that the district court should have suppressed the gun, his spontaneous confession, and the ammo found at his home. In reviewing the denial of a motion to suppress, we review legal issues de novo and the district court's factual findings for clear error. *United States v. Ramamoorthy*, 949 F.3d 955, 964 (6th Cir. 2020). The latter requires that we give "great deference to the district court's credibility determinations." *United States v. Johnson*, 344 F.3d 562, 567 (6th Cir. 2003).

### 1.

Starting with the firearm, everyone agrees that Officer Reed permissibly seized the handgun from the seat of the Santa Fe under the plain-view doctrine.[3] *See Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Any constitutional violation requiring suppression, then, must have occurred before that time. Prigmore points to three purported infringements of his Fourth Amendment rights. We see none.

Prigmore first takes aim at the reliability of the anonymous tip that led Officer Reed to Prigmore in the first place. It's true that an anonymous tip without any subsequent corroboration may fail to create reasonable suspicion justifying an investigatory stop, *Florida v. J.L.*, 529 U.S.

---

[2]To the extent Prigmore argues that his confession on the stand undermines his competency, we disagree. Criminal defendants regularly exercise their constitutional rights in inadvisable ways. Defendants may "consent to incriminating searches, conduct their own criminal defense as they see fit, and—perhaps most harmful but rational all the same—confess to the commission of a crime," but that does not render them incompetent. *Tucci-Jarraf*, 939 F.3d at 797 (citations omitted).

[3]The gun's "incriminating character" was "immediately apparent," *Dickerson*, 508 U.S. at 375, because Ohio law prohibits carrying an unsecured firearm in the passenger compartment of a vehicle, Ohio Rev. Code. § 2923.16(B–C).

266, 270 (2000), but Prigmore misses the fact that the quality of the tip in this case became irrelevant as soon as Officer Reed saw the Santa Fe unlawfully parked in a handicap space. Prigmore never contends that he was seized before Officer Reed saw the Santa Fe double parked; and once Officer Reed observed that parking violation, it provided all the suspicion necessary to briefly detain the vehicle and its occupants. *See Arizona v. Johnson*, 555 U.S. 323, 327 (2009) (holding police may "detain an automobile and its occupants pending inquiry into a vehicular violation" without "addition[al] cause to believe any occupant . . . is involved in criminal activity"); *Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); *United States v. Copeland*, 321 F.3d 582, 594 (6th Cir. 2003) (holding that *Whren* extends to parking violations).

Prigmore next asserts that he was unconstitutionally seized when Officer Reed ordered him back into the vehicle. Not so. Law enforcement may order passengers out of the car during a traffic stop based on the "weighty interest in officer safety" and "minimal" intrusion on the passenger's liberty. *Maryland v. Wilson*, 519 U.S. 408, 413–15 (1997). Ordering Prigmore to stay in the vehicle likewise allowed Officer Reed to remain in "command of the situation," *id.* at 414 (quotation marks omitted), and an officer asking a passenger to remain *inside* the vehicle invades his personal liberty no more than ordering him *out* of the car, *United States v. Walker*, 575 F. App'x 146, 148 (4th Cir. 2014); *United States v. Sanders*, 510 F.3d 788, 790 (8th Cir. 2007); *United States v. Williams*, 419 F.3d 1029, 1034 (9th Cir. 2005); *Rogala v. District of Columbia*, 161 F.3d 44, 53 (D.C. Cir. 1998); *United States v. Moorefield*, 111 F.3d 10, 13 (3d Cir. 1997).

Finally, Prigmore claims that he was unconstitutionally seized when Officer Reed ordered him out of the Santa Fe upon seeing the apparent handgun in the door pocket. This argument misses the mark too. For one thing, Officer Reed could have ordered Prigmore out of the vehicle even if he had not seen the firearm. *See Wilson*, 519 U.S. at 415. For another, once "police officers reasonably fear that suspects are armed and dangerous, they may order the suspects out of a car and may draw their weapons when those steps are reasonably necessary for the protection of the officers." *Houston v. Clark Cnty. Sheriff Deputy John Does #1–5*, 174 F.3d

809, 814–15 (6th Cir. 1999) (quotation marks omitted).  Officer Reed reasonably feared that Prigmore was armed and dangerous upon seeing what appeared to be a firearm within his reaching distance.  It's irrelevant that the weapon turned out to be only a BB gun.  The district court permissibly credited Officer Reed's testimony that some BB guns can appear indistinguishable from real firearms, and we won't second guess that credibility decision here.  *See Johnson*, 344 F.3d at 567.  Officer Reed did not violate Prigmore's constitutional rights in seizing the firearm.

2.

We turn next to Prigmore's spontaneous statement and begin with another point of agreement: *Miranda* plays no part in the analysis because Prigmore's confession was unprompted.  *See United States v. Cole*, 315 F.3d 633, 637 (6th Cir. 2003).  Instead, Prigmore maintains that his statement should have been suppressed because it was made involuntarily.  As Prigmore sees things, he was incapacitated at the time of his admission, contrary to testimony from the arresting officer.

This argument fails for two reasons, one legal and one factual.  First, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *accord United States v. Luck*, 852 F.3d 615, 623 (6th Cir. 2017) ("[E]ven if defendant's cognitive or volitional capacity was impaired, that 'is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary.'" (quoting *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989))).  Prigmore does not identify any law enforcement action that prompted his inculpatory statement, let alone anything coercive.  His "mental condition, by itself and apart from its relation to official coercion," cannot render his statement involuntary in the constitutional sense.  *Connelly*, 479 U.S. at 164.

Even if it could, the district court concluded that the government had met its burden of showing that Prigmore's mental state had improved enough by the time he was being booked into jail that his confession was voluntary.  That finding was supported by extensive, detailed

testimony from Agent Gragan.  Prigmore offers little in the way of rebuttal, retorting only that it was "magical[]" that his mental condition could have improved so much in twenty-five minutes. That conclusory proclamation is hardly enough to demonstrate clear error.

3.

Finally, Prigmore argues that the district court should have suppressed the ammunition found during the search of his home because the underlying search warrant was faulty.  He first contends that the warrant was fruit of the poisonous tree because it was based on the gun found during the October 21 encounter with XPD and Prigmore's booking-room confession.  Having concluded that both items of evidence were lawfully obtained, this argument fails right out of the gate.

Prigmore also asserts that the warrant was not supported by probable cause to search for firearms and ammunition because the supporting affidavit described only a drug conspiracy.  The affidavit, however, elaborated on the common nexus between drug trafficking and firearms—a link repeatedly recognized throughout the law.  *E.g.*, *United States v. Ware*, 161 F.3d 414, 417–18 (6th Cir. 1998).  And the facts of this case bear that out.  The affidavit noted that Prigmore had been arrested on narcotics charges on numerous occasions; that he was found in possession of a firearm just days before; that narcotics were found in the possession of one of the other passengers in the Santa Fe; and that both occupants had recently come from Prigmore's residence.  We see no error in the district court's conclusion that the affidavit set forth probable cause to search for firearms and ammunition.

C.

In the final issue on appeal, Prigmore argues that his sentence is substantively unreasonable.  In other words, he claims "that the court placed too much weight on some of the § 3553(a) factors and too little on others."  *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018).  An inquiry into substantive reasonableness looks to "the totality of the circumstances, including the extent of any variance from the Guidelines range."  *Gall v. United States*, 552 U.S. 38, 51 (2007).  We review for abuse of discretion, giving "due deference" to the district court's application of the § 3553(a) factors.  *Id.* at 51, 59.

Prigmore makes only one argument in support of this claim: that the district court contradicted itself by imposing an above-Guidelines sentence based on Prigmore's "unwillingness to admit his mental health issues," while simultaneously recognizing that Prigmore's mental illness might preclude him from making such an admission. Prigmore misunderstands the court's reasoning. The court was clear that it was imposing an above-Guidelines sentence because Prigmore's untreated "mental condition . . . increases the recidivism risk, it increases the danger to the community." Put differently, the district court was not punishing Prigmore for refusing to get help; it was acknowledging that Prigmore's refusal—whether caused by his APD or not—increased his danger to society. The district court did not abuse its discretion in imposing a modest upward variance to account for what it reasonably perceived as Prigmore's high risk of reoffending.

\* \* \*

We AFFIRM Prigmore's conviction and sentence.