NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0041n.06

No. 21-5482

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td rowspan="11">

**FILED**
Jan 24, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE</td></tr>
<tr><td style="padding-left:2em">Plaintiff-Appellee,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>ZACHARY FUCHS,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td style="padding-left:2em">Defendant-Appellant.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

Before: COLE, LARSEN, and MURPHY, Circuit Judges.

LARSEN, Circuit Judge. A jury convicted Zachary Fuchs of possessing with the intent to distribute more than 50 grams of methamphetamine, in violation of 21 U.S.C. § 841. Fuchs appeals his conviction, arguing that the district court should have suppressed the drugs, excluded evidence of his prior narcotics offense, and declared a mistrial based on a witness's improper remarks. We reject each challenge and AFFIRM.

I.

A.

While on traffic patrol, Gallaway Police Department (GPD) Officer David Nabors pulled Fuchs over for driving without a license plate. Fuchs stopped in the parking lot of a nearby business, partially blocking its driveway. Nabors approached Fuchs, who, according to Nabors, was "immediately combative" and accused Nabors of lying about the missing license plate.

Nabors asked for Fuchs's license and registration, but Fuchs had neither. Nabors later testified that he smelled marijuana upon his initial contact with Fuchs.

Armed only with Fuchs's name, date of birth, and social security number, Nabors returned to his vehicle to run Fuchs's information. Nabors realized at that time that he had accidentally activated the light on his body camera, rather than the camera itself; Nabors fixed his mistake, and the record includes video footage of the events from this point forward. The dispatcher reported that Fuchs had a prior felony conviction for manufacturing methamphetamine, had once stolen a vehicle while fleeing arrest, and allegedly carries a handgun. Nabors testified that, while he was talking to dispatch, he saw Fuchs moving around in his vehicle. GPD Captain James Mayes soon arrived and approached the driver's door of Fuchs's vehicle. Knowing that Mayes was not privy to Fuchs's alleged handgun possession and based on Fuchs's prior movements, Nabors decided to cut the dispatch call short and detain Fuchs.

Nabors asked Fuchs to step out of the vehicle, then frisked and handcuffed him. Nabors questioned Fuchs about the vehicle; Fuchs said it belonged to his girlfriend's ex-boyfriend, but he could not be sure it was not stolen. Meanwhile Mayes looked in the door jamb and under the hood of Fuchs's car, trying to find a vehicle identification number (VIN) to confirm Fuchs's story. Nabors then asked whether there was anything illegal in the car, and Fuchs responded, "there might be a blunt, a little half joint or something." After the questioning, Mayes walked Fuchs back to his squad car.

Noticing that they were blocking a semi-truck that was trying to exit the parking lot, Mayes asked Nabors to move both Fuchs's and Nabors's vehicles. Nabors did so, and, after moving Fuchs's car, rolled up the driver's window "[t]o keep the odor inside" and "make it easier on [his

drug] dog to go to the source of the odor." Nabors then retrieved his narcotics canine, Kilo, from his vehicle. Kilo alerted at the driver's door and the back hatch of Fuchs's car.

Based on Kilo's alerts, Nabors and Mayes searched Fuchs's car. Under the driver's seat, next to Fuchs's shoes, Nabors found a plastic bag containing what appeared to be methamphetamine residue. He then found a bag containing about a pound of methamphetamine behind a removable compartment below the radio.

## B.

After a grand jury indicted Fuchs on one count of possessing methamphetamine with the intent to distribute, *see* 21 U.S.C. § 841(a)(1), he moved to suppress the drugs and all statements he made after being handcuffed. Relevant here, Fuchs argued that Nabors lacked reasonable suspicion to initiate a traffic stop, exceeded the scope of the stop by handcuffing him, unreasonably searched Fuchs's vehicle when he moved it, and relied on Kilo's unreliable alert to search the car. The government disagreed and added that, in any event, the narcotics inevitably would have been found during an inventory search of the car after it was towed.

A magistrate judge held an evidentiary hearing on the motion. Nabors, the only witness, testified to the events described above. Fuchs's attorney cross-examined Nabors on several points, but two are particularly relevant here: First, he asked about Nabors's claim to have smelled marijuana, pointing out that Nabors failed to include anything about the odor in his arrest affidavit and didn't question Fuchs about it at the time. Nabors responded that he listed only Kilo's alert on the affidavit because that was "why [he] went in the car," but he admitted that "the marijuana smell would have been a probable cause as well." Counsel also asked about why Mayes looked under the hood of Fuchs's car. Nabors explained that the officers were trying to determine whether

the car was stolen, and that Mayes later told him that he had to look under the hood for the VIN because the number on the door "had been painted over."

The magistrate judge recommended denying the suppression motion as to the drugs but granting it as to Fuchs's statements. She credited Nabors's testimony about Fuchs's demeanor and furtive movements, which, when combined with the report that he might have been armed, justified detaining Fuchs in handcuffs. She also found credible Nabors's testimony about the marijuana smell, which gave him probable cause to search Fuchs's vehicle. Finally, she credited Nabors's description of Kilo's search procedure and found that Kilo did in fact alert on Fuchs's vehicle. The magistrate concluded, however, that the statements Fuchs made while handcuffed were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and therefore should be suppressed.

Shortly after the magistrate judge issued her report and recommendation, Fuchs moved to re-open the evidentiary record underlying the suppression motion. He claimed to have discovered new evidence calling Nabors's credibility into question. The district court granted the motion and scheduled a new hearing.

C.

At the second suppression hearing, the government again called Nabors. While his testimony largely matched that from the first hearing, a few differences stand out. First, the marijuana odor: Although Nabors again said that he detected an odor of marijuana on his initial encounter with Fuchs, he also stated that he "wasn't thinking at all about narcotics" after questioning Fuchs outside the vehicle because he "wouldn't think anybody would be traveling with narcotics in their vehicle without a tag on it." On cross-examination, Nabors conceded that he didn't ask Fuchs about the alleged marijuana smell, explaining that he "was waiting on another

officer to get there"; Nabors said he didn't tell Mayes about the marijuana either because, by the time Mayes arrived, "officer safety was [his] biggest concern." Fuchs's attorney again confronted Nabors about his failure to mention the marijuana smell in the arrest ticket, despite his having been trained to include such information. And for the first time, Fuchs introduced a transcript of Nabors's testimony from a state court suppression hearing concerning the same events, in which Nabors didn't mention the marijuana smell at all.

The defense also confronted Nabors about his prior testimony that the VIN on the door of Fuchs's car had been "painted over." After seeing a photo of the VIN plate, Nabors conceded that the number was not actually painted over, and that his prior testimony was based solely on what he had been told by someone else.

The defense then called Mayes, who by then was Chief of GPD. His testimony cast doubt on Nabors's testimony in several ways. First, he didn't believe that Nabors had accidentally activated the flashlight on his body camera, explaining that "Nabors knows more about that body cam than you think" and that he had previously started recording "in the middle" of stops. Mayes then testified that he did not smell marijuana upon encountering Fuchs, that he believed Nabors would have told him at the time if he smelled marijuana, and that he was surprised to hear that Nabors later claimed to have smelled marijuana. Mayes also stated that when he arrived, Fuchs was "just on the phone," not making any suspicious movements.

Finally, Mayes impeached Nabors's credibility more generally. He explained that, within two weeks of becoming Chief, he disciplined Nabors twice and that Nabors quit the department shortly thereafter. Mayes also described his concerns with hiring Nabors initially, explaining that "no one else" had wanted to hire him because "he's a bad apple." And when asked if he would trust what Nabors said under oath, Mayes was blunt: "I don't trust him, period. . . . He couldn't

even tell me the truth about just small things. . . . I could ask him a question just between us if something was going on, and he would just flat-out just lie to me." Mayes's testimony wasn't all bad though. On cross, Mayes admitted that he didn't remember anything that would "cause him to question" Nabors's actions during the stop, and that Nabors had done "no wrong to Mr. Fuchs" that day.

Even with the new evidence, the district court denied Fuchs's motion to suppress the drugs but suppressed the statements Fuchs made while handcuffed. The court first credited Nabors's testimony that Fuchs's vehicle did not have a license plate, which was corroborated by body camera footage. The court then found credible Nabors's testimony about Fuchs's combative demeanor and furtive movements, which justified the decision to handcuff him as a safety precaution. Turning to Nabors moving Fuchs's vehicle, the court explained first that Nabors's action did not constitute a search under the Fourth Amendment at all because Nabors was not attempting to gather information. The court did not specifically address whether rolling up the driver's door window to preserve any narcotics odors constituted a search. But in any event, the court noted that Nabors had probable cause to search the vehicle based on the marijuana smell. Recognizing that Nabors had failed to mention such a smell in his arrest affidavit or state court testimony, the district court nonetheless found his testimony credible; and while the court believed Mayes's testimony that he did not smell marijuana, it noted that the odor could have dissipated through the vehicle's open windows by the time Mayes arrived. The court then reviewed the evidence of Kilo's reliability and concluded that his alert gave Nabors probable cause to search the vehicle. Finally, the court held that even if the vehicle search violated the Fourth Amendment, the exclusionary rule should not apply because the drugs inevitably would have been discovered when Fuchs's vehicle was towed and inventoried.

D.

Fuchs proceeded to trial.  Before trial, the government notified Fuchs that it intended to introduce his 2004 conviction for manufacturing methamphetamine.  The district court ruled that the conviction was admissible.  The court determined that the government was offering the conviction for two permissible purposes, knowledge and intent.  It then explained that while the conviction was quite old, Fuchs had been incarcerated for most of the intervening period and noted that a limiting instruction could reduce the risk of prejudice.

The government called Nabors as its first witness at trial.  His testimony tracked his statements at the two suppression hearings.  When Nabors relayed what dispatch had told him about Fuchs's prior conviction for manufacturing methamphetamine, the judge interrupted and instructed the jury that it could consider that fact "only" for "the Defendant's intent, motive and knowledge," but not for "any other purpose."[1]  The government did not enter the actual conviction record into evidence as an exhibit, and it did not come up again during Nabors's testimony.

The government next called Mayes, who testified that law enforcement had not been able to identify who owned the vehicle that Fuchs had been driving.  On cross, Fuchs's attorney asked Mayes questions similar to those he had posed to impeach Nabors in the second suppression hearing.

The government's next witness, a DEA chemist, testified that the substance recovered from Fuchs's car was 475 grams of 99% pure methamphetamine.

---

[1] Nabors mistakenly testified that dispatch had also relayed a prior burglary conviction.  Fuchs's attorney immediately objected and moved for a mistrial; the judge excused the jury.  After some negotiation, the defense agreed to withdraw its motion conditioned on the judge informing the jury that Fuchs had no burglary conviction.  When the jury returned, the judge told the jury just that and instructed it to disregard Nabors's statement about the supposed burglary.  Fuchs does not challenge these actions on appeal.

Finally, the government called DEA special agent Lauren Carney to testify as an expert on drug trafficking. She explained that methamphetamine users typically purchase one gram at a time, that one ounce (approximately 28 grams) of methamphetamine sells for between $300 and $500 in the Memphis area, and that a pound (about 450 grams) of methamphetamine is "absolutely" a distributable amount. Towards the end of Carney's direct examination, the following exchange occurred:

> Q: So in this case, we've identified about a pound of methamphetamine recovered in this traffic stop, right? And are you familiar with who was in that vehicle or was there anyone in the vehicle?
>
> A: I know there was a driver in the vehicle. I'm not really familiar with anything else[.]
>
> Q: In your opinion do traffickers with a pound or more of methamphetamine intend to distribute that methamphetamine?
>
> A: Yes. That's a distributable amount.
>
> Q: And in this particular case who do you believe possessed that methamphetamine?
>
> A: I believe the driver was in possession of the methamphetamine.
>
> Q: And what is the basis for that opinion?
>
> A: Well, the driver was the sole occupant of the car. I believe the driver had a history of methamphetamine.

The defense immediately asked for a sidebar, where Fuchs's attorney objected that Carney's mention of Fuchs's history was "pure propensity" evidence and moved for a mistrial. He acknowledged, however, that the prosecutor did not "mean[] to" elicit that statement and did not "s[ee] it coming." The court denied Fuchs's mistrial motion and instructed the jury to disregard the prior question and response. After a brief cross and redirect, Carney stepped down and both parties rested.

The jury found Fuchs guilty of possessing with the intent to distribute more than 50 grams of methamphetamine.

## II.

Fuchs appeals his conviction on three grounds. First, he argues that the district court should have suppressed the drugs as the product of an unlawful search. Second, he contends that the court should have excluded evidence of his prior methamphetamine manufacturing conviction. Finally, Fuchs asserts that the court should have declared a mistrial after Carney mentioned his drug history.

## A.

We begin with suppression. While we review the district court's legal analysis on a suppression motion de novo, *United States v. Haynes*, 301 F.3d 669, 676 (6th Cir. 2002), Fuchs has little complaint about that aspect of the court's decision. He primarily takes issue with several of the court's factual findings: that his car didn't have a license plate, that he was "combative" and made "furtive" movements, that Nabors smelled marijuana, and that Kilo reliably alerted to the presence of narcotics. In reviewing these findings, our role is limited to looking for clear error. *Id.* And because the contested findings all depend on Nabors's credibility, our review is even more deferential. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). The district court's decision to credit the testimony of one witness over another is "virtually never" clear error, so long as the witnesses' stories are facially plausible, internally consistent, and uncontradicted by extrinsic evidence. *Id.*

To his credit, Fuchs acknowledges that he faces an uphill battle. This case, he says, is "one of those rare cases" in which a witness's story is so implausible that we must overrule the district court's judgment that the story should be believed. We disagree.

1.

Fuchs first takes aim at the initial traffic stop. An officer may constitutionally stop a vehicle when he has probable cause to believe a traffic violation has occurred, *United States v. Lott*, 954 F.3d 919, 922 (6th Cir. 2020), and Tennessee law requires all vehicles to bear a rear license plate, Tenn. Code Ann. § 55-4-110. In light of Nabors's other inconsistencies and "convenient[]" failure to activate his body camera, Fuchs says the district court clearly erred in crediting Nabors's testimony that Fuchs's car did not have a license plate.

We see no clear error. Nabors testified at both suppression hearings that Fuchs's car lacked a license plate, Nabors's body camera footage confirms that fact, and Fuchs presented no evidence to the contrary. Fuchs makes too much of the few minutes during which Nabors's camera was off. Nabors said he made a mistake in pressing the wrong button on the camera—a mistake he chalked up to having "fairly big fingers"—while Mayes explained why he thought that excuse wasn't believable. Both stories are "coherent," "facially plausible," "internally []consistent," and "not contradicted by extrinsic evidence," so the judge's decision to believe Nabors cannot be clear error. *Anderson*, 470 U.S. at 575. Since Nabors observed Fuchs driving without a license plate, the initial traffic stop was lawful.

2.

Fuchs next challenges Nabors's decision to handcuff him, arguing that doing so exceeded the lawful scope of the traffic stop. He does not dispute that during a stop, an officer who reasonably fears that a suspect is armed and dangerous may detain and handcuff him as a safety precaution. *See United States v. Prigmore*, 15 F.4th 768, 778 (6th Cir. 2021); *United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007). Rather, Fuchs says we shouldn't believe Nabors's description of his behavior.

Again, we see no clear error. Start with what isn't in dispute: The dispatcher told Nabors that Fuchs allegedly carries a firearm. No one contends that Nabors acted unreasonably in relying on that report. *Cf. Herring v. United States*, 555 U.S. 135, 146–48 (2009). Add to that Nabors's account of Fuchs's demeanor. Both at the time of the encounter (as captured by the body camera) and at the suppression hearing, Nabors described Fuchs as "combative." *See Atchley*, 474 F.3d at 849 (suspect's nervous behavior and officer's experience justified detention and handcuffing). Fuchs presented no evidence to rebut this description, and despite his request, we cannot say the district court clearly erred in refusing to throw out Nabors's entire testimony based on Mayes's impeachment of Nabors's honesty. There, too, the district court was best positioned to determine who to believe. *See Anderson*, 470 U.S. at 575.

Nor did the district court clearly err in crediting Nabors's description of Fuchs's suspicious movements during Nabors's conversation with dispatch. On one hand, Nabors's testimony aligned with his description of Fuchs's behavior to the dispatcher (again captured by body camera footage); on the other, Mayes, who seemingly had a better vantage point, said Fuchs was just talking on the phone at that time. Our job is not to decide, in the first instance, whether to believe Mayes over Nabors. The clear-error standard "does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced it would have decided the case differently." *Id.* at 573. Nabors and Mayes both gave plausible, internally consistent accounts of Fuchs's behavior, uncontradicted by extrinsic evidence, so the district court's decision to credit the former cannot be clear error. *Id.* at 575.

In light of Fuchs's demeanor, behavior, and alleged firearm possession, Nabors reasonably feared for his and Mayes's safety, so he did not violate the Fourth Amendment in detaining and handcuffing Fuchs.

3.

That brings us to Fuchs's challenge to Nabors's moving his vehicle and rolling up the window, and (almost) to the first legal question of this case: Did Nabors's actions constitute a "search" within the meaning of the Fourth Amendment? But before we can reach that question, Fuchs must overcome yet another factual hurdle. The district court credited Nabors's testimony that he smelled marijuana upon initially encountering Fuchs. Unless that finding is clearly erroneous, it does not matter whether Nabors conducted a "search"; the marijuana smell alone would have given Nabors probable cause to search Fuchs's car under the automobile exception to the warrant requirement. *United States v. Johnson*, 707 F.3d 655, 658 (6th Cir. 2013).

Here again, Fuchs falls short of demonstrating clear error. Nabors testified at both suppression hearings that he smelled marijuana upon encountering Fuchs, even after repeated clashes over the issue on cross-examination. Fuchs's lawyer asked Nabors point blank, "You didn't smell marijuana, did you?" And Nabors stood his ground: "Yes, sir. I did." Mayes's contrary testimony does not require reversal. As the district court noted, because Mayes arrived later, it is possible that the smell had dissipated by the time he arrived. That's a possibility we cannot ignore since we must take the evidence in the light most favorable to the government. *Haynes*, 301 F.3d at 676. Moreover, even if their stories had been irreconcilable, both were plausible and consistent with the extrinsic evidence, so the district court could not have clearly erred by choosing Nabors's story over Mayes's. *Anderson*, 470 U.S. at 575.

What about the objective evidence that Nabors didn't mention the marijuana smell to Mayes on the scene, or in his arrest affidavit or state court testimony? Nabors gave plausible explanations for the first two supposed contradictions: His attention was focused on officer safety by the time Mayes arrived; and when he wrote the arrest ticket, he keyed in on Kilo's alert because

that was why he searched the car. As for the state court testimony, Fuchs's counsel didn't give Nabors an opportunity to explain; he simply introduced the transcript, then moved to other matters, so we don't know why Nabors failed to mention the marijuana odor at that hearing. Because each alleged contradiction had a plausible explanation, the district court was left to make another credibility judgment. Exercising its "wide latitude" in that area, *Haynes*, 301 F.3d at 679, and based on its unique opportunity to view each witness's demeanor and tone, *Anderson*, 470 U.S. at 575, the court decided to believe Nabors's story, notwithstanding his other omissions. Whether we would make that same judgment is irrelevant. All we may decide is whether the court clearly erred in believing Nabors. *Id.* at 580–81. That's a high bar, and Fuchs cannot clear it.[2]

Because the marijuana smell gave Nabors probable cause to search Fuchs's vehicle, the district court properly denied Fuchs's motion to suppress. We need not address Kilo's reliability, the inevitable-discovery rule, or whether rolling up Fuchs's car window was a search.

B.

In the second issue on appeal, Fuchs argues that the district court erred by admitting evidence of his 2004 conviction for manufacturing methamphetamine. According to Fuchs, the conviction had little (if any) probative value for a permitted purpose such as knowledge or intent, yet was quite likely to be used by the jury to show propensity—once a drug dealer, always a drug dealer. *See* Fed. R. Evid. 403, 404. Fuchs's argument implicates two intra-circuit splits, *see United States v. Carter*, 779 F.3d 623, 625 (6th Cir. 2015) (standard of review); *United States v. Hardy*,

---

[2] Fuchs directs our attention to *Bullman v. City of Detroit*, 787 F. App'x 290, 298 (6th Cir. 2019), in which we held that "the fact that the officers did not discover any marijuana in [the suspect's] car raises a question about the credibility of the officers' account that" they smelled marijuana. That holding does not undermine our conclusion that the district court did not clearly err. *Bullman* stands for the simple proposition that failure to discover marijuana can undermine an officer's claim to have smelled marijuana. That fact, like the officer's demeanor and tone, may enter the factfinder's calculus of whether to believe the officer, but it is by no means dispositive.

643 F.3d 143, 152 (6th Cir. 2011) (permissible purpose of prior drug conviction), and raises unexplored questions about how temporal proximity affects admissibility. We need not tackle those issues today, though, because we are convinced that any error was ultimately harmless.

Rule 52 of the Federal Rules of Criminal Procedure dictates that we "must" disregard any error that does not affect the defendant's substantial rights. Fed. R. Crim. P. 52(a). The government bears the burden of showing harmlessness. *United States v. Kettles*, 970 F.3d 637, 644 (6th Cir. 2020). If we can say "with fair assurance" that the jury's verdict was not "substantially swayed" by the error, then it cannot be a basis for reversal. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

The government's case against Fuchs meets this standard. To secure a conviction, the government had to prove that Fuchs knowingly possessed a controlled substance with intent to distribute. 21 U.S.C. § 841(a)(1); *United States v. Allen*, 619 F.3d 518, 522 (6th Cir. 2010). Consider the undisputed evidence that all parties agree was fair game: Fuchs was the sole occupant of a vehicle in which over a pound of methamphetamine was found; the car was not registered to anyone else and there was no other known driver; a baggie with methamphetamine residue was found in the floorboard of the driver's seat, next to Fuchs's shoes; and a pound of methamphetamine is "absolutely" a distributable quantity[3]—thousands of doses worth over $5,000.

---

[3] Fuchs argues on appeal that a pound of methamphetamine would be only a ninety-day supply for a heavy user like himself. But he didn't make this argument or offer any evidence to support it at trial. Indeed, when cross-examining Carney, Fuchs's counsel seemed to concede that this was a distributable quantity:

> Q: Just so we're clear, this is not a possessory or small amount. You can't use this in one day or one week. This is a whole lot of meth, do you agree with that?
> A: Agreed.
> Q: No doubt this is to be sold?
> A: Yes.

Fuchs himself seems to acknowledge the weight of the government's evidence. In arguing that his prior conviction was only minimally probative of his intent and knowledge, he concedes that "the government had plenty of evidence that [he] was the sole occupant of the vehicle where the methamphetamine was found, which would establish knowledge and intent." Such alternative-proof reasoning is an effective way of diminishing the probative value of a challenged piece of evidence. *See Old Chief v. United States*, 519 U.S. 172, 183 (1997). But in the harmlessness context, it amounts to a defendant "fall[ing] on his own sword." *United States v. Ayoub*, 498 F.3d 532, 548 (6th Cir. 2007); *see also Hardy*, 643 F.3d at 153–54. Nor is this a case in which the alternative evidence tends to prove one, but not all elements of the offense, *see United States v. Jenkins*, 593 F.3d 480, 486 (6th Cir. 2010) (noting government offered overwhelming evidence of knowledge and intent, but not possession); *see also Hardy*, 643 F.3d at 160 (Cole, J., dissenting) (limiting *Ayoub*'s harmlessness analysis to cases in which the evidence is overwhelming on every element); Fuchs's sole occupancy of the vehicle is all but conclusive evidence of possession too.

Finally, although we recognize that evidence of earlier crimes often has "a powerful and prejudicial impact," *United States v. Johnson*, 27 F.3d 1186, 1193 (6th Cir. 1994), the government's trial strategy lessened that likelihood in this case. After introducing the prior conviction through Nabors, the government immediately moved to other matters. The government did not elicit, through Nabors or anyone else, the details of that conviction, nor did it enter the conviction record into evidence. The matter briefly arose again during Carney's testimony, but the court immediately instructed the jury to disregard her comment. And in closing, the government brought up the prior conviction, but said only that the jury could consider that evidence for "intent, motive and knowledge in this crime," without elaborating on how the conviction would tend to prove those facts. In light of the other very strong evidence against Fuchs and the

government's minimal use of the prior conviction, we are convinced that any error in admitting the conviction was harmless.

C.

Finally, Fuchs contends that the district court should have declared a mistrial after Carney testified that Fuchs "had a history of methamphetamine." We review the denial of a motion for a mistrial for abuse of discretion. *United States v. Howard*, 621 F.3d 433, 458 (6th Cir. 2010). For a motion based on improper testimony, we first ask whether the statements were in fact improper. *Id.* If so, we assess whether the testimony's damage was incurable based on five factors:

> (1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant.

*Id.* at 459 (quoting *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003)).

There is little dispute that Carney's remark was improper. The government conceded as much in the sidebar that immediately followed her statement, agreeing that the court should strike the testimony and instruct the jury to disregard it. And while the prior conviction had been admitted for limited purposes under Rule 404(b), Carney's testimony employed that conviction for a prohibited purpose: propensity. *See* Fed. R. Evid. 404(a).

But Fuchs's success on the threshold question doesn't extend much further. Four of the *Howard* factors favor the district court's decision not to declare a mistrial. Fuchs admits that Carney's remark was not solicited. Nor was it "foreseeable." After the prosecutor elicited that Carney knew that there was a "driver in the vehicle" and that she believed "the driver was in possession of the methamphetamine," the prosecutor asked Carney's basis for that opinion. Having discussed only the occupancy of the vehicle, all that was foreseeable was the first sentence

of Carney's response: "Well, the driver was the sole occupant of the car." The prosecutor could not reasonably have known that Carney would bring up Fuchs's drug history. That's especially true in light of, as Fuchs's attorney put it to the district court, Carney's "responsibility as a DEA agent not to bring up prior convictions for the jury." Moreover, Fuchs concedes that the district court's limiting instruction was immediate and clear. He never alleges that bad faith motivated the prosecutor's question, and, in fact, admitted in the district court that the prosecutor did not "mean[] to" elicit a response about the prior conviction. And, as explained above, the prior conviction was ultimately a small part of the case against Fuchs.

Fuchs is right that the line of questioning was unreasonable. "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b). Experts may speak in hypotheticals without running afoul of this rule; that is, they may "describe[] in general terms the common practices of those who clearly do possess the requisite" mental state. *United States v. Combs*, 369 F.3d 925, 940 (6th Cir. 2004) (quoting *United States v. Frost*, 125 F.3d 346, 383 (6th Cir. 1997)). But the government went beyond that here. The prosecutor asked Carney about who "in this particular case" possessed the methamphetamine, and Carney answered, "the driver" based on the fact that, in this case, "the driver" was the sole occupant of the car. She testified, in other words, about Fuchs's mental state—knowing possession—not the mental state of a hypothetical defendant in similar circumstances.

But tellingly, Fuchs did not object to the line of questioning on this ground in the district court. And we see little harm in the fact that Carney's opinion was couched in too specific terms. Had it heard the same testimony in the form of the "common practice[]" that sole occupants of a vehicle with drugs inside "clearly do possess the requisite" knowledge of those drugs, the jury

would readily have drawn the inference that Fuchs, "caught engaging in more or less the same practice[]," knew about the drugs. *Combs*, 369 F.3d at 383 (quoting *Frost*, 125 F.3d at 384).

In sum, four of the five *Howard* factors are squarely in the government's favor, and the only factor on Fuchs's side carries little weight on this record. The district court did not abuse its discretion in denying Fuchs's motion for a mistrial.

* * *

For the reasons above, we AFFIRM the judgment of the district court.